No. 23-4058

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

KRISTIN JACOBS, legal guardian of E.J.;
AMANDA SANDY, legal guardian of H.S.;
AND DISABILITY LAW CENTER,
*Plaintiffs-Appellants,*
v.
SALT LAKE CITY SCHOOL DISTRICT;
and BOARD OF EDUCATION OF SALT
LAKE CITY SCHOOLS,
*Defendants-Appellees.*

On appeal from the United States District Court, District of Utah,
Honorable Jill N. Parrish, No. 2:21-cv-00706-JNP-CMR

**BRIEF OF APPELLANTS**

Laura Henrie
Michelle Marquis
Katie Cox
Maya V. Anderson
DISABILITY LAW CENTER
960 South Main Street
Salt Lake City, Utah 84101
(801) 363-1347
lhenrie@disabilitylawcenter.org
mmarquis@disabilitylawcenter.org
kcox@disabilitylawcenter.org
mvanderson@disabilitylawcenter.org

*Attorneys for Appellants*

**ORAL ARGUMENT REQUESTED**

September 22, 2023

# Table of Contents

Table of Authorities ................................................................................ iii

Prior or Related Appeals ........................................................................ vi

Jurisdictional Statement ........................................................................ 1

Statement of the Issues Presented for Review ........................................ 2

Introduction .......................................................................................... 4

Statement of the Case and Facts ........................................................... 6

    SLCSD's Special Education Services and Their Locations Throughout the
    District .......................................................................................... 6

    E.J. ................................................................................................ 9

    H.S. ............................................................................................... 14

    Salt Lake City School District and the Hub Plan ........................... 17

    Administrative Process ................................................................... 21

    Federal District Court. ................................................................... 23

    Tenth Circuit Court of Appeals ..................................................... 24

Summary of the Argument ..................................................................... 24

Standard of Review ............................................................................... 27

Argument ............................................................................................... 28

    The District Court's Holding that *Urban* and *Murray* Foreclose All Claims
    Fundamentally Misunderstands Appellants' Claims and Relief
    Requested……………………………………………….………………………28

The District Court Confuses and Conflates Placements with the Location of Service Delivery Under the IDEA ................................................................32

Tenth Circuit Precedent Confirms a Right to Individualized Assessments and Individualized Education Programs (IEPs) ................................................. 35

The District Court Did not Adequately Analyze Plaintiffs' Discrimination Claims Under the ADA ................................................................................42

The Tenth Circuit Reviews Allegations of Facial Discrimination within Educational Systems Under Discrimination Statutes ...................................45

Failing to Appropriately Analyze Discrimination Claims Will Lead to Unchecked Discrimination Against Students with Disabilities ...................47

The District Court's Order Extends the Holdings in *Murray* and *Urban* in a Manner that is Inconsistent with Controlling Precedent .............................48

The District Court Erred When It Failed to Acknowledge E.J. and H.S.'s Appeals of their Administrative Decisions ....................................................50

The District Court Erred in Finding Appellants' Section 504 Claim Does not Qualify as a Systemic Violation and is Therefore not Exempt from Exhaustion ................................................................................................52

Conclusion ........................................................................................................58

Statement of Counsel as to Oral Argument .........................................................59

Certificate of Compliance .....................................................................................60

Certificate of Digital Submission .........................................................................61

Certificate of Service ...........................................................................................62

## Attachments

A.    Memorandum Decision & Order (Dkt. 50, Filed 03/31/2023) (JA 229)

B.    Judgment in a Civil Case (Dkt. 51, Filed 03/31/2023) (JA 246)

ii

# Table of Authorities

<u>Cases</u>

*Ass'n for Cmty. Living in Colo. v. Romer*,
  992 F.2d 1040 (10th Cir. 1993) ............................................................. 52, 53, 55

*Bragdon v. Abbott*,
  524 U.S. 624 (1998) ........................................................................................ 45

*Carroll v. Lawton Indep. Sch. Dist. No. 8*,
  805 F.3d 1222 (10th Cir. 2015) ...................................................................... 27

*Dubbs v. Head Start, Inc.*,
  336 F.3d 1194 (10th Cir. 2003) .................................................................... 6, 27

*Ellenberg v. New Mexico Military Institute*,
  478 F. 3d 1262 (10th Cir. 2007) ........................................... 33, 43, 44, 47, 49, 53

*Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*,
  580 U.S. 386 (2017) ........................................................................................ 50

*Fry v. Napoleon Cmty. Sch.*,
  580 U.S. 154 (2017) .................................................................................... 54, 57

*G.W. v. Boulder Valley Sch. Dist.*,
  2019 WL 4464130 (D. Colo. Sept. 18, 2019) ..................................................... 33

*Garcia v. Board of Educ. of Albuquerque Public Sch.*,
  520 F.3d 1116 (10th Cir. 2008) ...................................................................... 28

*Honig v. Doe*,
  484 U.S. 305 (1988) ........................................................................................ 33

*Luna Perez v. Sturgis Pub. Sch.*,
  598 U.S. 142 (2023) .................................................................................... 54, 55

*Murray by and through Murray v. Montrose Cnty. Sch. Dist. RE-1J*,
  51 F.3d 921 (10th Cir. 1995) ...................................... 2, 28, 35, 36, 37, 38, 40, 41

*New Mexico Association for Retarded Citizens*,
  678 F.2d 847 (10th Cir. 1982) ................................................................ 39, 40, 45

*Petrella v. Brownback,*
  697 F.3d 1285 (10th Cir. 2012) ............................................................. 31

*Urban by Urban v. Jefferson Cnty. Sch. Dist. R-1,*
  89 F.3d 720 (10th Cir. 1996) .................................................. 2, 28, 39, 40, 41,42

Statutes

20 U.S.C. § 1415(g)(1-2), (i)(2)............................................................... 23

20 U.S.C. § 1415(i)(2)(A-C) ...................................................................... 1

28 U.S.C. § 1291 ....................................................................................... 1

28 U.S.C. § 1331 ....................................................................................... 1

28 U.S.C. § 1343 ....................................................................................... 1

29 U.S.C. § 794 ......................................................................................... 1

42 U.S.C. § 12132 ..................................................................................... 1

Utah Code Ann. § 53G-6-402(2) ............................................................. 7

Rules

10th Cir. R. 28.2(C)(3) ............................................................................ vi

Rule 4(a) of the Federal Rules of Appellate Procedure ........................... 1

Rule 12(b)(1) ........................................................................................... 23

Rule 12(b)(6) ............................................................. 23, 24, 27, 28

Regulations

34 C.F.R. §300.300(b)(3)(i-iii)................................................................ 22

34 CFR § 300.115 .................................................................................................. 32

Other Authorities

USBE SpEd Rules III.Q. ........................................................................................ 32

USBE SpEd Rules IV.N., IV.Q. ............................................................................ 23

**Prior or Related Appeals**

Pursuant to 10th Cir. R. 28.2(C)(3), there are no prior or related appeals.

# Jurisdictional Statement

Pursuant to 28 U.S.C. § 1331, a district court has jurisdiction over any civil action arising under the constitution or laws of the United States. Pursuant to 28 U.S.C. § 1343, a district court has jurisdiction over any civil action authorized to be commenced by any person to secure equitable or other relief under any Act of Congress providing for the protection of civil rights. Appellants' claims arise under Title II of the Americans with Disabilities Act, as Amended (the "ADA"), 42 U.S.C. § 12132 *et seq.*, the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1415(i)(2)(A-C).

On March 31, 2023, the District Court entered an Order granting Appellees' Motion to Dismiss all of Appellants' claims. This is an appeal of right pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure, filed timely on April 28, 2023. (JA.1:247-48[1].) This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1291.

---

[1] Appellants refer to the parties' Joint Appendix as "JA."

## Statement of the Issues Presented for Review

1. Whether the District Court, in granting Appellees' Motion to Dismiss in its entirety, i) accepted all allegations in the *Amended Complaint* as true, and ii) drew all reasonable inferences in Appellants' favor.

2. Whether the District Court erred when it failed to analyze the difference between placement in a self-contained special class and placement in a general education setting in evaluating the hub system's effect on Appellants' claims.

3. Whether the District Court misapplied and improperly extended the holdings of *Murray* and *Urban* when it analyzed Appellants' claims.[2]

4. Whether the District Court erred when it failed to analyze Appellants' ADA discrimination claims before dismissing them, including failing to consider allegations that the hub system systemically discriminates against Appellants because they have intellectual disabilities and/or cognitive impairments.

5. Whether the District Court erred when it found that Appellants were required to exhaust their Section 504 Rehabilitation Act claims because i) the claims were not systemic in nature, and ii) the IDEA's process could have provided the relief requested.

---

[2] *Murray by and through Murray v. Montrose Cnty. Sch. Dist. RE-1J*, 51 F.3d 921 (10th Cir. 1995); *Urban by Urban v. Jefferson Cnty. Sch. Dist. R-1*, 89 F.3d 720 (10th Cir. 1996).

6. Whether the District Court erred in dismissing E.J. and H.S.'s IDEA due process appeals at the Motion to Dismiss stage.

**Introduction**

This appeal concerns whether the District Court misapplied the motion to dismiss standard and erroneously dismissed Appellants' claims under the ADA, Section 504 of the Rehabilitation Act, and IDEA. Appellants alleged that Salt Lake City School District's ("SLCSD" or "the District") hub school policy, implemented in 2019, discriminated against children on the basis of the category and severity of disability, provided unequal educational opportunities, and precluded individualized placement decisions.

Appellants E.J. and H.S. are school-age children with intellectual disabilities and/or cognitive impairments who are eligible to receive special education services individualized to their needs. Both E.J. and H.S. have strong social skills, and greatly enjoy interacting with other students. In addition, E.J. and H.S. have demonstrated the ability to succeed in a general education environment, yet neither E.J. nor H.S. can be considered for a general education placement in their neighborhood school, nor any other location, due to SLCSD's hub system.

The hub system predetermines that any child with an intellectual disability and/or cognitive impairment will be assigned to a special class placement that only operates at a hub school. Based on their IQ score, a student will either be categorized as "mild/moderate" or "severe," and assigned to the corresponding special class. Notably, this determination is made without regard for the terms

listed in individualized education programs ("IEPs"), but rather by virtue of a student's particular diagnosis and IQ score.

By making a determination that children with intellectual disabilities and/or cognitive impairments must be assigned to a special class placement and a hub school, any chance of attendance at a neighborhood school *or* any hope of placement within a general education classroom is precluded.

At the same time the hub system was being implemented, the Disability Law Center, Utah's Protection and Advocacy Agency ("DLC"), was contacted by multiple families in SLCSD, expressing concern over the District's hub plan and its negative impact on their children.

Based on their inability to have general education placements considered under the discriminatory hub scheme, E.J. and H.S. each filed due process complaints on behalf of themselves and similarly situated students. After receiving adverse due process decisions, E.J., H.S., and the DLC brought claims in federal district court alleging violations of the IDEA, ADA, and Section 504 of the Rehabilitation Act.

In a ruling on SLCSD's Motion to Dismiss, the District Court found that Tenth Circuit precedent precluded relief under each of the Appellants' claims. However, in reaching this decision, the District Court inappropriately narrowed the relief requested by Appellants, conflated the terminology used in the relevant

caselaw, and failed to contend with the multiple facts alleged throughout the *Amended Complaint,* which must be taken as true. Specifically, the Court did not analyze facts throughout the *Amended Complaint* that alleged SLCSD's hub system categorically removed children with intellectual disabilities and/or cognitive impairments from general education placements on the basis of their disability category, rather than on any individualized the basis. As a result, Appellants' claims should not have been dismissed for failure to state a claim as a matter of law.

### Statement of the Case and Facts

Because this is an appeal from the District Court's dismissal of all of Appellants' claims, the facts alleged must be taken as true with all reasonable inferences drawn in Appellants' favor. *Dubbs v. Head Start, Inc*., 336 F.3d 1194, 1201 (10th Cir. 2003).

### SLCSD's Special Education Services and Their Locations Throughout the District

SLCSD provides special education services in order to serve a wide variety of students with differing educational needs. (JA.1:067 ¶131; JA.1:075-76 ¶¶186-90; JA.1:079 ¶207.)

Specifically, SLCSD has special education teachers at each school, and utilizes models that maximize access to general education placements and to the general education curriculum by drawing upon push-in and pull-out services, as

well as resource models. *Id.* In addition, related service providers such as occupational and physical therapy providers travel to all schools in the District. (JA.1:076 ¶189.)

Due to these services that already exist at each school, SLCSD students without intellectual disabilities or cognitive impairments are routinely able to attend the school within their geographic boundary along with their siblings, friends, and neighbors, and to be placed in a general education setting. (JA.1:045 ¶¶9-11.)

SLCSD has 27 elementary schools, six middle schools, and three high schools within its boundaries, and provides special education services to students at each of these schools. (JA.1:045 ¶12; JA.1:104-108.)[3] Students without intellectual disabilities or cognitive impairments are allowed to attend any of the schools that fall within their geographic boundary. (JA.1:045 ¶13.)

In Utah, the ability to attend the school that best fits a particular child's needs is codified in statute. Utah Code Ann. § 53G-6-402(2). This allows students to attend any school so long as enrollment is not at capacity. (JA.1:045 ¶¶14-15.)

However, unlike their nondisabled peers and peers without intellectual disabilities and/or cognitive impairments, Appellants E.J. and H.S., and similarly

---

[3] Nibley Park is counted as both an elementary school and a middle school, as it serves students K-8.

situated children with intellectual disabilities and/or cognitive impairments are unable to attend the school that best fits their needs, regardless of the enrollment numbers. (JA.1:045 ¶16.)

While SLCSD's system allows for general education placements for students with all other kinds of disabilities, it prohibits them for students with intellectual disabilities and/or cognitive impairments. (JA.1:069 ¶145; JA.1:075 ¶¶181-82,186.) This is because SLCSD preassigns all students with intellectual disabilities and/or cognitive impairments to a disability category of "mild/moderate" or "severe". (JA.1:069 ¶144; JA.1:074-75 ¶¶177,182.) This designation is based on their disability category, IQ score, and the perceived need for accommodations in the classroom for all students in that category. (JA.1:045 ¶17; JA.1:075 ¶¶181-85.) Then, SLCSD further assigns those students to special class placements housed at "hub" schools based on their categorical designation. (JA.1:045 ¶18; JA.1:069 ¶144.)

For decades, SLCSD students with intellectual disabilities and/or cognitive impairments have been categorically barred from being placed in a general education setting, and therefore, attending their neighborhood school. (JA.1:069 ¶147.) The District has a long held pattern and practice of consolidating services for children designated as members of "mild/moderate" or "severe" disability categories at a limited number of locations within the District. (JA.1:069 ¶¶148-

50.) In March 2019, The District announced a plan to create "hub" schools where children with intellectual disabilities and/or cognitive impairments would be further congregated at specific schools. (JA.1:069-70 ¶¶151-52; JA.1:088-100.) This new plan ultimately took the practice already in place and solidified it into a public-facing system that was reviewed and approved by the Board of Education of Salt Lake City Schools. (JA.1:070-71 ¶¶157,162.)

When SLCSD first announced its "hub school" plan in March 2019, many of the public-facing justifications for the change centered around the idea that SLCSD had historically not been providing education to these students in the least restrictive environment. (JA.1:072 ¶166.)

**E.J.**

E.J. is a warm and outgoing child with a diagnosis of Williams syndrome who attended Indian Hills Elementary ("Indian Hills") at the time the "hub" school plan was announced in March 2019. (JA.1:059-60 ¶¶86,94.) E.J. receives special education and related services under the eligibility classification "Other Health Impairment." (JA.1:050 ¶50.)

Williams syndrome is characterized by mild intellectual disability, developmental delays, and medical problems, including cardiovascular disease. (JA.1:059 ¶87.) These cognitive components of Williams syndrome often occur side by side with striking verbal abilities, highly social personalities, and an

affinity for music. *Id.* Because E.J.'s particular deletion of genes in chromosome 7 is shorter than that of a typical child with Williams syndrome, she experiences fewer serious medical conditions and is more academically advanced. E.J. still struggles with visual-spatial functioning, including depth perception, and receives treatment for a cardiovascular condition. (JA.1:059 ¶88.)

E.J. enrolled in SLCSD in 2014, where, due to the cognitive nature of Williams syndrome, she was immediately assigned to the "mild/moderate" special class placement. (JA.1:059 ¶89.) During elementary school, E.J. was moved to four different schools; each time, because the associated "mild/moderate" special class had moved to a different location. *Id.* As a result, E.J. has spent the entirety of her educational career in the SLCSD with the same small group of grade-level peers, also categorized as "mild/moderate." *Id.*

E.J.'s relevant IEPs show that her reading comprehension skills were at or above grade level, and that she had been able to complete grade-level math problems and access grade level math curriculum with scaffolded materials. (JA.2:254-55.) E.J. also displayed strong age-appropriate social skills. (JA.2:255.)

At no time in E.J.'s educational history did the District consider a placement in the general education setting in her neighborhood school with existing special education services prior to placing E.J. in the "mild/moderate" special class. (JA.1:059 ¶90.)

In the Spring of 2019, SLCSD announced that they would be consolidating students designated as "mild/moderate" to three "hub" elementary schools. SLCSD refers to the special class placement for "mild/moderate" students as the "Academic Support program." E.J.'s parents were concerned that E.J. would be forced to move schools again and that the new system would only serve to further isolate E.J. from all peers outside the "mild/moderate" category. (JA.1:060 ¶91.)

In May of 2019, E.J.'s parents were informed by the IEP team that E.J. would be moving to Emerson Elementary ("Emerson") with her "Academic Support" special class in the Fall of 2019. (JA.1:060 ¶92.) At the time of the meeting, the District had already determined that all "mild/moderate" students would be moving to a consolidated hub school, including E.J. No IEP team meeting was convened to discuss that decision prior to it being made. (JA.1:060 ¶93.)

E.J.'s parents requested that the IEP team consider a general education placement that would have allowed E.J. to attend Dilworth Elementary ("Dilworth") instead of Emerson. (JA.1:060 ¶94.) Such a change would have allowed E.J. to attend school with her little sister and friends from her neighborhood. E.J. had not been allowed to attend Dilworth for the previous two years because she had been automatically assigned to the "mild/moderate" special class at Indian Hills. *Id.*

E.J.'s parents were told that E.J.'s "mild/moderate" placement would remain, and that she must join the rest of her class in the move to Emerson. (JA.1:060 ¶95.)

However, E.J.'s IEP identified no justification for her removal from a general education placement. (JA.2:254.)

While Shelley Halverson ("Ms. Halverson"), the Special Education Director at the time, indicated that E.J.'s placement in the "mild/moderate" special class was not being changed, she simultaneously assured E.J.'s parents that they could expect significant changes to E.J.' special education programming. (JA.1:061 ¶¶96-97.) Specifically, Ms. Halverson stressed that, at Emerson, E.J. would no longer be placed in a standard self-contained classroom; instead, she would participate in a "blended class" model, spending much of her class time in a general education classroom along with all the other students in her "mild/moderate" special class. (JA.1:061 ¶98.)

E.J.'s parents opposed the move from Indian Hills to Emerson, but because they believed she could not continue to receive special education services if she did not comply with the consolidated hub plan, they eventually enrolled her at Emerson. (JA.1:061 ¶99.)

As a result of implementation of the hub plan, E.J.'s time spent on the bus to and from Emerson significantly increased. (JA.1:061 ¶100.)

<u>The "Mild/Moderate" Hub School Class</u>

While at the hub school, E.J.'s educational programming varied significantly. The variance was not attributable to changes in E.J.'s IEP, or placement, but simply to the resources the District made available to the "mild/moderate" special class grouping. (JA.1:061-62 ¶¶101-102.) Despite assurances from Ms. Halverson to the contrary, during the first year of the hub school from 2019-2020, E.J.'s time spent with nondisabled peers actually diminished from what she had been afforded at Indian Hills. (JA.1:061 ¶101; JA.2:256.)

Conversely, and without any official change in placement noted in her IEP, E.J. and the rest of the 7-8 "mild/moderate" students spent the vast majority of the 2020-2021 year in a general education classroom receiving instruction in the general education environment. (JA.1:062 ¶102; JA.2:256.) Despite this change to the level of inclusion in the general education setting, E.J., and all other "mild/moderate" students, continued to be assigned to their special class placements. (JA.1:062-63 ¶¶106-08.) E.J. has demonstrated success in this general education environment but must still be grouped with all other "mild/moderate" students in the curiously titled "Academic Support" special class placement pursuant to the hub system. (JA.1:063 ¶108.)

Due to the hub system's requirement that all children with intellectual disabilities and/or cognitive impairments must be placed in a special class, E.J. simply cannot be considered for a general education placement. (JA.1:071 ¶158; JA.1:062-63 ¶¶107-08.) As a result of the hub system's rigidity, the extent to which E.J. is afforded interaction with non-disabled peers, and the extent to which it is deemed appropriate or necessary for her to learn academic subjects in the general education setting is not determined by her IEP, nor her demonstrated success in that environment. (JA.1:062-63 ¶¶106-08.) Rather, it is predetermined by the District's administrative scheme to provide resources to all "mild/moderate" students in a particular hub in any given year. (JA.1:071 ¶158; JA.1:074-45 ¶¶177,181.) As a result, neither E.J. nor any other child in the "mild/moderate" class is guaranteed the same level of inclusion they experienced in the 2020-21 school year.[4] *Id.*

### H.S.

H.S. is a cheerful and friendly child with a diagnosis of Down syndrome who, at the time of filing, was enrolled in elementary school at Bonneville Elementary ("Bonneville"). (JA.1:063 ¶110.)

---

[4] E.J. is now in middle school and continues to be subject to the District's hub policy. Her subsequent access to the general education setting has not been as inclusive as it was in the 2020-2021 school year.

Although virtually all individuals with Down syndrome exhibit some degree of intellectual disability, each individual's level of impairment in various areas fall along a broad spectrum; as such, it is impossible to reduce all of this diversity of skills, experience, and personality down to a universal model. (JA.1:063 ¶111.) For students with Down syndrome to reach their full potential, it is imperative that teachers make a consistent effort to learn and understand the strengths and weaknesses of each individual student, rather than adopt a "one-size-fits-all" approach based on stereotypes of what individuals with Down syndrome are capable of. (JA.1:063 ¶112.)

H.S. performs at the "mild" or "moderate" range across the three areas used to evaluate intellectual disability and does not demonstrate performance in any domain in the "severe" or "profound" range. (JA.1:065 ¶121.)

Prior to the 2019-20 school year, H.S. attended a private school known as the "Children's Synergistic Learning Collective" ("CSLC"), where he participated in a blended classroom with disabled and nondisabled students. (JA.1:064 ¶114.) Students received instruction in a range of subjects including math, science, and reading. *Id.* This resulted in a learning environment where H.S. had the opportunity to engage in meaningful social interactions and participate fully in a general education setting. *Id.* During the six years H.S. attended CSLC, he was never separated from other students because of his Down syndrome. *Id.*

H.S. thrived in his blended class at CLSC, and H.S.'s parents anticipated that he would be provided with the same opportunity at SLCSD in a general education setting. (JA.1:064 ¶115.)

H.S.'s parents registered H.S. in SLCSD in March 2019, intending for H.S. to start third grade at Bonneville in a general education placement at his neighborhood school in the fall of 2019. (JA.1:051 ¶55.) H.S. began attending Bonneville in August 2019. (JA.1:051 ¶56.)

However, at an IEP meeting in Fall 2019, H.S.'s parents learned that the District was unwilling to consider a general education placement at H.S.'s neighborhood school due to the cognitive nature of Down syndrome. *Id.* Instead, the IEP team identified H.S. as a "severe" category student and informed H.S.'s parents that he would therefore be placed in the associated "Essential Elements" special class placement. *Id.* This required removal to the Highland Park Elementary ("Highland Park") "severe" hub school, as this was the only option available to students categorized as "severe" under the hub plan. *Id.*

When H.S.'s parents objected to the proposed placement in "Essential Elements," the District stated that if H.S.'s parents refused to agree to the placement, SLCSD would not provide any special education services to H.S. (JA.1:064-65 ¶¶116,119.)

Ultimately, H.S.'s parents did not agree to H.S.'s placement in "Essential Elements", and as a result, H.S. was cut off from receiving any special education services. (JA.1:051 ¶57.)

In addition, the District directed its special education and related staff not to speak with H.S.'s parents or interact in any way with H.S. This included providing the response to intervention services that H.S. had received at Bonneville, and that are available to all students regardless of IDEA eligibility. (*Id.*; JA.2:281-82.)

Every justification SLCSD offered for its decision to place H.S. in a self-contained class at a hub school ultimately rests on the configuration of its existing service delivery model: H.S. supposedly requires a "severe" classroom because he has been deemed a "severe" student, and "severe" classrooms only exist at hub schools. (JA.1:066 ¶123.) The categorical designation of H.S. as a "severe" student is also inconsistent with H.S.'s previous performance at the individual level. (JA.1:065 ¶122.)

**Salt Lake City School District and the Hub Plan**

At the time the 2019 policy was presented to the SLCSD School Board, then Special Education Director, Ms. Halverson, stated that SLCSD intended to create "hub" schools to house its special class placements. (JA.1:070 ¶153.) The presentation indicated that students would forever be grouped by the disability severity categories of "mild/moderate" and "severe." (JA.1:070-71 ¶¶153-57.)

Ms. Halverson made it clear that SLCSD would *not* consider the individual needs, or IEPs, of students when assigning them to their special class placements at a hub school: "So, regardless of a student's disability, they would go to one of these hubs." (JA.1:071 ¶158.)

While developing this proposal, SLCSD did not systematically consult with parents whose children would be moved and failed to hold IEP meetings to discuss the possibility of these students receiving services in general education placements at their current school, or in returning to their neighborhood school. (JA.1:071 ¶¶159-63.)

In addition, parents who did request an IEP meeting to discuss the hub school system were not given the option of exploring a general education placement. Rather, they were told that they must agree to the move if they wanted their students to continue receiving special education services. (JA.1:071 ¶164.)

The District presumes all students with an intellectual disability and/or cognitive impairment shall be placed in a special class. (JA.1:070-71 ¶¶154,158; JA.1:074-75 ¶¶175-77,181-84.) Then, they use an IQ score of 70 as a dividing line between a placement in a "severe" or "Essential Elements" special class and a "mild/moderate" or "Academic Support" special class. (JA.1:075 ¶¶184-85.)

As a result, students in the District who are classified as having a "mild/moderate" or "severe" intellectual disability or cognitive impairment are

categorically excluded from consideration of a placement in general education, the first stop along the continuum of placements. (JA.1:075 ¶181.) This practice was further confirmed by two District employees who are often a part of recommending placements for students with intellectual disabilities and/or cognitive impairments. (JA.1:075 ¶182.) Both confirmed that, in their nineteen and eleven years, respectively, neither had recommended that a single student with a cognitive impairment be placed in the general education environment at their neighborhood school. *Id.* One employee further indicated that he would categorically not consider placement in a general education setting for a student with an IQ at or below 70. (JA.1:075 ¶183.)

In setting District policy, SLCSD has favored rigid categorization and segregated group programs to the total exclusion of any effort to facilitate access to individualized supports in the general education environment with collaborative support from special education personnel. (JA.1:079 ¶208.)

Impact of Hub System

Data taken from the District's "mild/moderate" elementary school hubs shows an increase in the percentage of the student body receiving services via an IEP at each of these three schools in the wake of the hub plan's implementation. The U.S. Department of Education has stressed the importance of providing for "the inclusion of children with disabilities in proportion to their presence in the

general population," otherwise known as "natural proportions." (JA.1:073 ¶¶169-170.)

In addition to clustering students with intellectual disabilities and/or cognitive impairments in certain locations, the hub system has also resulted in longer transportation times for many of these students. The average duration of an individual special education hub school bus route was 61.3 minutes each way the year after the hub school plan was implemented. Several other hub school bus routes were in excess of 90 minutes, and the longest afternoon bus route reached 121 minutes. (JA.1:073 ¶¶171-74.)

During this time, the DLC, Utah's Protection and Advocacy Agency, was contacted by multiple families in SLCSD expressing concern over the District's hub plan and its negative impact on their children. (JA.1:053 ¶66.)

Because special education and related services are widely available at schools all throughout the District, the "hub" plan is not designed to deliver intensive or unique services to students with intellectual disabilities and/or cognitive impairments. (JA.1:074 ¶¶175-77.) Rather, it is simply the District's preference to serve all students identified as "mild/moderate" or "severe" in the same segregated special classes in a limited number of locations. (JA.1:079 ¶¶207-09.) The apparent motivations for this configuration are staff availability, lack of space, and other administrative conveniences—each of which are proscribed

outright as inappropriate reasons to remove a student from the general education setting under the law. (JA.1:079 ¶210.) The District has also acknowledged that other proscribed factors, such as financial considerations, have played a determinative role in placement decisions within the hub system scheme. *Id.*

**Administrative Process**

<u>E.J.</u>

E.J. filed a Request for Due Process Hearing with the Utah State Board of Education on March 4, 2021. (JA.2:250-75.) E.J. alleged violations of the IDEA and the ADA on behalf of herself as well as similarly situated students. *Id*. In a preliminary Order on March 23, 2021, the Hearing Officer dismissed E.J.'s ADA claims as well as those on behalf of similarly situated students citing a lack of jurisdiction. (JA.1:015.)

A formal hearing was held from September 13-16, 2021, on E.J.'s individual IDEA claims. During the proceedings, the Hearing Officer in E.J.'s case refused to allow evidence or discussion of the hub system's effect on E.J.'s placement. (JA.1:048 ¶¶35-36.) On November 10, 2021, the Hearing Officer issued a formal decision and found against E.J. on each of her IDEA claims and also reaffirmed dismissal of E.J.'s ADA claims as well as those on behalf of similarly situated students. (JA.1:014-31.)

<u>H.S.</u>

H.S. filed a Request for Due Process Hearing with the Utah State Board of Education on September 17, 2021. (JA.2:277-302.) H.S. alleged violations of the IDEA and the ADA on behalf of himself as well as similarly situated students. *Id*.

On October 7, 2021, the Hearing Officer, *sua sponte*, requested formal briefing on the issue of whether or not H.S.'s parents had properly consented to special education services under 34 C.F.R. §300.300(b)(3)(i-iii) of the IDEA. (JA.1:034.) The parties submitted simultaneous briefing on October 27, 2021.

On November 1, 2021, the Hearing Officer ordered dismissal for the Defendants, making a factual determination that H.S.'s parents had not properly consented to special education services, and that he was therefore not entitled to continue to a due process hearing on his IDEA claims. (JA.1:034-42.) The Hearing Officer also ruled to exclude H.S.'s claims on behalf of similarly situated students and H.S.'s claims "pursuant to the [ADA] or alleging discriminatory acts or effects involving the Student." (JA.1:034-36.)

<u>Utah's IDEA Administrative Process has Only One Tier</u>

In "one-tier" states, the state department of education conducts the due process hearing and the losing party can appeal to state or federal court. In states with a "two-tier" system, there is an opportunity for state-level review following the due process hearing decision before moving to federal court; Utah is not such a

state. Unlike in a "two-tier" system, there is no additional step available for review in a "one-tier" system. Following a due process hearing in Utah, the only next step is to file a civil action in state or federal court. (JA.1:047 ¶26; 20 U.S.C. § 1415(g)(1-2), (i)(2); USBE SpEd Rules IV.N., IV.Q. (published June 2023.))

**Federal District Court**

E.J., H.S., and the DLC, on behalf of similarly situated students, filed a Complaint in federal district court against Salt Lake City School District and the Board of Education of Salt Lake City Schools on December 1, 2021, and filed an *Amended Complaint* on May 16, 2022. (JA.1:043-87.) Claims were brought under the ADA, Rehabilitation Act, and IDEA alleging that the District's hub school policy, implemented in 2019, discriminated against children on the basis of the category and severity of disability, provided unequal educational opportunities, and precluded individualized placement decisions. *Id.* This also served as an appeal from E.J. and H.S.'s adverse IDEA due process decisions. (JA.1:049 ¶¶40,47.)

The District filed a 12(b)(1) and 12(b)(6) Motion to Dismiss all claims on June 13, 2022. (JA.1:120-64.) Pursuant to Rule 12(b)(1), the District argued that E.J., H.S., and the DLC lacked Article III standing because they had not suffered an injury-in-fact, E.J. and H.S.'s claims were not redressable, and the DLC did not have associational or organizational standing. (JA.1:137-51.) The District also argued that E.J., H.S., and the DLC had not administratively exhausted their

Section 504 claims. (JA.1:151-54.) Finally, pursuant to 12(b)(6), the District

argued that the Tenth Circuit cases of *Urban* and *Murray* foreclose the "absolute

right" to education in the neighborhood school and incorrectly characterized this as

the singular relief sought by Plaintiffs. (JA.1:155-62.)

Following briefing, the court held oral arguments on March 29, 2023.

(JA.3:303-69.)

On March 31, 2023, the District Court found E.J., H.S., and the DLC had

standing; however, it dismissed the Section 504 claim without prejudice for failure

to exhaust administrative remedies, and granted the District's 12(b)(6) Motion to

Dismiss on the IDEA and ADA claims because Plaintiffs could not "plead around"

the precedent set by *Murray* and *Urban*. (JA.1:229-45.)

**Tenth Circuit Court of Appeals**

E.J., H.S., and the DLC filed their Notice of Appeal of the District Court's

dismissal on April 28, 2023. (JA.1:247-48.) Pursuant to the Tenth Circuit's order,

the parties engaged in mediation commencing on June 1, and concluding on July

26, 2023.

**Summary of the Argument**

The District Court erred in granting SCLSD's Motion to Dismiss. First,

SLCSD failed to make individualized placement decisions in violation of the

IDEA; second, SLCSD subjected Appellants to unequal educational opportunities solely due to the nature of their disabilities in violation of the ADA and Rehab Act.

The Court erred in concluding that all of Appellants' claims must be dismissed because it fundamentally misunderstood the nature and scope of the relief requested. The Court inappropriately narrowed Appellants' requests for declaratory and injunctive relief to only an "absolute right" to attend their neighborhood schools. This is explicitly not the relief Appellants seek.

The District Court confused and conflated terminology and language used in the relevant caselaw when it dismissed Appellants' IDEA claims. Specifically, the District Court never defined, nor analyzed what an educational placement under the IDEA is, nor how such a placement is made, including what services must be considered before removal from the general education setting.

The District Court erred in concluding that *Murray* and *Urban* "[did] not leave the door open for this court to find that the IDEA or the ADA requires the SLCSD to make individualized determinations as to where special education services should be provided." To the contrary, neither *Urban* nor *Murray* create an absolute bar to receiving special education services in a general education placement at a neighborhood school. Specifically, *Urban* and *Murray* are distinguished from the present facts because they are about an individual child, not a policy decision by a school district. In addition, the students in *Urban* and

*Murray* were not challenging their placement decisions, or the degree to which they were being included in general education. Both cases were solely about the location of the services, and whether the neighborhood school was the presumptive least restrictive environment. The opposite is true for Appellants who are challenging both their placement decisions, and the discriminatory hub policy.

The District Court also erred when it did not provide an adequate analysis of Appellants' claims under the ADA. Rather than confront the numerous facts alleged in the *Amended Complaint* that assert the hub policy is not based on individual IEPs, but rather on the IQ scores, and particular disability categories of these students, the District Court simply says that *Urban* and *Murray* also preclude these claims. However, the Tenth Circuit has found that the IDEA is typically not sufficient for analyzing or addressing claims of discrimination.

The District Court erred when it found that Appellants' Section 504 claims are not exempt from the IDEA's exhaustion requirement. Contrary to the ruling, the claims asserted by Appellants do not require individualized assessment, as they assert claims of discriminatory treatment that could be made on behalf of any student with an intellectual disability or cognitive impairment in SLCSD. Appellants assert that they are being denied access to existing services because of their disabilities. As a result, Appellants' claims pose a purely legal question, and should be exempt from the IDEA's exhaustion requirement.

The effect of the District Court's ruling is that the right to individualized placement decisions cannot exist where a student is challenging a more restrictive placement that has removed them from the general education environment in their neighborhood school. Such an outcome is inconsistent with both Tenth Circuit and Supreme Court precedent.

## Standard of Review

The District Court dismissed Appellants' claims in their entirety under Rule 12(b)(6). The court's function on a Rule 12(b)(6) motion to dismiss is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted. *Dubbs*, 336 F.3d at 1201. When considering a Rule 12(b)(6) Motion, the Court must accept all of the factual allegations contained in the Complaint as true with all reasonable inferences drawn in the Plaintiff's favor. *Id*. at 1201. The Tenth Circuit has found that they "review the denial or grant of a motion to dismiss de novo, applying the same standard used by the district court." *Carroll v. Lawton Indep. Sch. Dist. No. 8*, 805 F.3d 1222, 1226 (10th Cir. 2015) (internal quotation marks omitted).

However, in cases involving the IDEA, the Tenth Circuit has determined that

Congress requires district courts to apply a modified *de novo* standard when reviewing agency disposition in the IDEA context. Specifically, the district court must (1) receive the record of the administrative proceedings, (2) hear additional evidence at the request of a party, and (3) base its decision on the

preponderance of evidence. At the same time, though the statute specifies that review is *de novo,* the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that 'due weight' must be given to the administrative proceedings, the fact findings of which are 'considered *prima facie* correct.' On appeal of the district court's judgment on the record, we are bound to apply these very same principles of review.

*Garcia v. Board of Educ. of Albuquerque Public Sch.*, 520 F.3d 1116, 1125 (10th Cir. 2008) (internal citations omitted).

In this instance, the District Court applied the typical 12(b)(6) standard but did not apply a modified *de novo* standard to Appellants' IDEA claims, nor did it acknowledge E.J. or H.S.'s respective administrative appeals.[5] (JA.1:241.)

## Argument

### The District Court's Holding that *Urban* and *Murray* Foreclose All Claims Fundamentally Misunderstands Appellants' Claims and Relief Requested.

The District Court erred by holding that Appellants' claims are foreclosed by *Urban* and *Murray*. *Urban by Urban v. Jefferson Cnty. Sch. Dist. R-1*, 89 F.3d 720 (10th Cir. 1996); *Murray by and through Murray v. Montrose Cnty. Sch. Dist. RE-1J*, 51 F.3d 921 (10th Cir. 1995). (JA.1:243.) The District Court fundamentally misunderstands Appellants' claims and relief requested; contrary to the District Court's position that the *Urban* and *Murray* precedents "do not leave the door open for this court to find that the IDEA or the ADA requires the SLCSD to make

---

[5] The District Court did not review the administrative records of E.J. or H.S.

individualized determinations as to where special education services should be provided" and that if a school district has decided to provide certain services in certain locations, they are "not required to consider providing specialized services in neighborhood schools on a case-by-case basis or to modify its program to accommodate the location preferences of the individual students," this is simply not the relief that Appellants seek. (JA.1:244-45.)

Appellants do not seek an "absolute right" to attend their neighborhood schools, but rather an individualized placement decision that 1) considers the full array of supplementary aids and services before removal from a general education classroom and 2) an individualized placement decision that is not categorically determined by their disability and an equal educational opportunity that includes meaningful consideration of attendance at the school they would attend if not disabled, as well as the opportunity to be educated in the most integrated setting appropriate to the individual child's needs. (JA.1:085-86.)

Relief Requested by Appellants in the *Amended Complaint*

The District Court frames Appellants' entire requested relief in two different ways, both of which are incorrect: first, as asking the court to "order the defendants to make individualized placement decisions for E.J. and H.S. and to meaningfully consider providing special education services to them in their neighborhood schools." (JA.1:231); and second, as asking the court to "order the SLCSD to

reconsider their individualized education programs and determine whether they can receive special education services at their local schools." (JA.1:243.) Curiously, these statements are as inconsistent with one another as they are with the total relief requested by Appellants in their *Amended Complaint*. These statements greatly abridge the total relief requested, as well as misstate Appellants' actual request for injunctive relief, which was for the court to "[o]rder SLCSD to make individualized placement decisions for each of the Plaintiffs based on their IEPs and meaningfully consider the full continuum of placement options and supplementary aids and services necessary to place them at their neighborhood schools." (JA.1:086 §VIII.E.).

Appellants also requested declaratory relief ordering that "Defendants are violating the rights of Plaintiffs and other similarly situated children under Title II of the ADA…the Rehab Act…[and] the IDEA." (JA.1:085 §VIII.A-C.), as well as asked the court to permanently enjoin Defendants from "denying Plaintiffs and similarly situated students with the school-based services they need in to enjoy equal educational opportunity to their non-disabled peers and to receive appropriate educational programs and services in the most integrated setting and least restrictive environment as required by the IDEA, Rehab Act, and Title II of the ADA." (JA.1:085 §III.D.)

Finally, Appellants sought not only declaratory and injunctive relief against the Appellees, but also "any other relief which is necessary and appropriate to protect the federal rights of Plaintiffs and similarly situated individuals." (JA.1:086 §VIII.H.) In *Petrella v. Brownback*, the Tenth Circuit explained that "[e]quitable relief can take many forms, and at this early stage of the proceeding the court should not assume it will be unable to fashion relief that could remedy any . . . violation found." 697 F.3d 1285, 1295 (10th Cir. 2012).

In sum, the plain language of Appellants' *Amended Complaint* stated that, in addition to declaratory relief, they seek to: 1) enjoin Defendants from denying student Plaintiffs and similarly situated students the services necessary to enjoy an equal educational opportunity under the ADA and Rehab Act; 2) to receive those services in the most integrated setting under the ADA and Rehab Act; 3) to reasonably modify their programs and services as needed to avoid discrimination against Plaintiffs and other students; 4) to receive services resulting in a free and appropriate public education in the least restrictive environment under the IDEA; 5) to make individualized placement decisions under the IDEA; 6) to meaningfully consider the full continuum of placement options and supplementary aids and services necessary to place student Plaintiffs in their neighborhood schools; and 7) any other relief which is necessary and appropriate to protect the federal rights of Plaintiffs and similarly situated individuals. (JA.1:081-86.) While only the sixth

item was addressed by the District Court, the relief requested by Appellants was far broader.

### The District Court Confuses and Conflates Placements with the Location of Service Delivery Under the IDEA

The District Court's decision hinges on the misunderstanding that "The plaintiffs cannot plead around *Murray* and *Urban* by requesting an order requiring the SLCSD to meaningfully consider providing services in neighborhood schools rather than asserting a right to placement in a local school." (JA.1:245.) The Court's assertion that Appellants' relief is wholly barred because what they are *actually* seeking is a "placement(s) at a local school" reflects the Court's conflation of "placement" with the idea of "enrollment" or "attendance." *Id.* The term "placement" within this context has a specific meaning.

The Code of Federal Regulations, and the Utah State Board of Education Special Education Rules identify five alternative placement options: 1) instruction in a regular class, 2) a special class, 3) a special school, 4) home instruction, and 5) in hospitals and institutions." 34 CFR § 300.115[6]; USBE SpEd Rules III.Q.

---

[6] <u>300.115</u> Continuum of alternative placements.
<u>(a)</u> Each public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services. <u>(b)</u> The continuum required in paragraph (a) of this section must— <u>(1)</u> Include the alternative placements listed in the definition of special education under <u>§300.39</u> (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions); and

(published June 2023). In addition, the Tenth Circuit has noted that

> Placement decisions must be based on the child's IEP, and made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options. Unless a child's IEP requires some other arrangement, the child should be educated in the school that he or she would attend if nondisabled.

*Ellenberg v. New Mexico Military Institute*, 478 F. 3d 1262, 1268-69 (10th Cir. 2007) (internal quotations omitted). The Supreme Court has further clarified that this continuum is steeped in the IDEA's mandate that any removal or other segregation from the general education environment will occur "only when the nature or severity of the handicap is such that education in regular classes ... cannot be achieved satisfactorily." *Honig v. Doe*, 484 U.S. 305, 311 (1988).

Courts have found that these options are considered along a "continuum" because the placements become more restrictive as a student is removed from the general education environment and spends less and less time with nondisabled peers. For example, a Colorado District Court noted, "On that continuum of placements, a residential facility is considered more restrictive than a day program, which is considered more restrictive than placement in a public school setting." *G.W. v. Boulder Valley Sch. Dist.*, 2019 WL 4464130 (D. Colo. Sept. 18, 2019).

---

(2) Make provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement.

Therefore, while the District Court mistakenly concluded that Appellants were truly seeking a "placement at a local school," that option does not properly exist within the IDEA's framework because it does not describe the position along the continuum of placements where the student will be receiving services—only the location where the services are housed. (JA.1:245.) In actuality, there is no "placement" at a neighborhood school; there is only a "placement" in a general education setting, special class, or other stop along the continuum. The District Court's opinion failed to acknowledge this distinction between location and placement, and did not contend with Appellants' numerous allegations that, within SLCSD, general education placements occur at neighborhood schools with the use of existing on-site services. (JA.1:241-45.) Because the District Court did not consider this important difference, its analysis also failed to adequately address Appellants' claims that they were being denied access to existing services in general education settings at their neighborhood schools due to the SLCSD's discriminatory hub policy. *Id*. The failure to contend with this distinction further plagued the Court's analysis in its application of *Urban* and *Murray.*

The District Court's confusion on this point is also highlighted in its analysis of *Murray* and *Urban* where it mistakenly concluded that the reason the Appellants' request for individualized placement decisions could not be granted stemmed from the fact that once an IEP team has determined placement in another

school is required "in order to receive specialized services, a school district 'is not obligated to fully explore supplementary aids and services before removing a child from a neighborhood school.'" (JA.1:244 (quoting *Murray*, 51 F.3d at 930).) Again, this language is imprecise because the District Court borrows "placement" as applied in *Murray* and *Urban* without ever analyzing what was alleged about "placement" in Appellants' case. (JA.1:242-45.) As a result, the Court presumed that, like in *Murray* and *Urban*, individual IEPs directed Appellants' placement in other schools, but never analyzed the facts alleged in the *Amended Complaint* that directly refuted this proposition. (JA.1:241-45.) The *Amended Complaint* specifically asserted that the discriminatory hub policy, and not the individual IEPs of students required a placement in a special education class at a separate school. (JA.1:059-66 ¶¶89-90,93,96,107-109,116-17,119,121-23; JA.1:069-71 ¶¶144-45,154-58,163-64; JA.1:074-75 ¶¶176-77,179,181-85.)

### Tenth Circuit Precedent Confirms a Right to Individualized Assessments and Individualized Education Programs (IEPs)

Both *Urban* and *Murray* are steeped in the individual facts of the individual student in each case, and what decisions their IEP teams made based on each student's individual situation. Here, the District Court evaluated the present case simply as a policy decision made by SLCSD and ignored the specific facts and histories of E.J. and H.S. as individual students, including that they had each appealed the findings of their respective due process cases. (JA.1:244; JA.2:249-

302; JA.1:012-42; JA.1:050-51 ¶¶48-59; JA.1:059-66 ¶¶86-123; JA.1:048-49

¶¶32-47.) Even if the District Court believed systemic relief was not available, E.J.

and H.S.'s individual inquiries should have proceeded. There was no

individualized analysis of E.J. or H.S., the steps taken and decisions made by their

IEP teams, or even if these two students were being provided with a free

appropriate public education ("FAPE"). *Urban* and *Murray* are not policy cases,

and so for the District Court to rely on them in evaluating the validity of Appellees'

hub policy writ large is problematic.

### *Murray*

The District Court interprets the *Murray* court to have held that "if a

student's individualized education program calls for placement in another school in

order to receive specialized services, a school district 'is not obligated to fully

explore supplementary aids and services before removing a child from a

neighborhood school.'" (JA.1:244 (quoting *Murray*, 51 F.3d at 930).) In applying

this imperfect interpretation, the District Court circularly reasons that any system

devised by a school district to "provide special education services in specific

locations" necessarily means that the school district "is not required to consider

providing specialized services in neighborhood schools on a case-by-case basis or

to modify its program to accommodate the location preferences of individual

students." (JA.1:244-45). But a school district creating a discriminatory system in

which they will only deliver certain "programs" for students in certain disability categories at certain schools does not mean that a student's IEP authentically requires placement in a special class at another school to receive services. Moreover, the *Murray* court instead held that "the LRE mandate does not include a presumption of neighborhood schooling, and a school district accordingly is not obligated to fully explore supplemental aids and services before removing a child from a neighborhood school. It is only so obligated before removing a child from a regular classroom with nondisabled children." 51 F.3d at 930.

 *Murray* is a case based on a factual record developed in one student's case. In *Murray*, the student was not asserting that they were being subjected to a systemically discriminatory policy, but rather an argument about whether the student in question was making sufficient progress in his general education placement at his neighborhood school. *Id.* at 924-25. *Murray* did not hold that no child may ever challenge their placement at a non-neighborhood school. Rather, *Murray* holds that there is not a presumption that a neighborhood school is necessarily the least restrictive environment for purposes of the IDEA. *Id*. at 930. *Murray* also reaffirms that there are instances where the neighborhood school would be the appropriate choice. Specifically, the *Murray* court noted "that a disabled child should be educated in the school he or she would attend if not disabled (i.e., the neighborhood school), *unless* the child's IEP requires placement

elsewhere." *Id*. at 929. Again, in the present instance, Appellants have asserted that their IEPs do not determine the placement at the hub schools, but rather SLCSD's impermissible and discriminatory motives such as administrative convenience and perceived severity of their disabilities. (JA.1:051 ¶¶56-57; JA.1:068-071 ¶¶141-158; JA.1:077 ¶197.) This was particularly evident in SLCSD's decision to subject all children with intellectual disabilities and/or cognitive impairments to their hub policy without first holding individual IEP meetings. (JA.1:071 ¶¶159-164.)

Further, the District Court does not contemplate the *Murray* court's clarification that a school district is "obligated to fully explore supplementary aids and services…before removing a child from a regular classroom with nondisabled children." 51 F.3d at 930. In *Murray*, the court found that the parents never objected to the degree to which the student was educated outside of the regular classroom but had only challenged his removal from the neighborhood school. *Id.* Here, however, both E.J. and H.S. wish to be educated in the regular classroom with appropriate supplementary aids and services, and that desire has been made repeatedly clear in IEP meetings, IDEA administrative processes, and during these proceedings. (JA.1:048 ¶35; JA.1:050-51 ¶¶51,57; JA.1:060 ¶94; JA.1:062 ¶103; JA.1:064-65 ¶¶115-16,118-119,122; JA.2:250-262; JA.2:277-289.). Additionally, Appellants' *Amended Complaint* asserts that each school already provides special education services for other students without intellectual disabilities and/or

cognitive impairments at each school within the district. (JA.1:067 ¶131; JA.1:075-76 ¶¶186-190; JA.1:079 ¶207.)

### *Urban*

In *Urban*, the Tenth Circuit held that the IDEA does not confer an individual right to attend a neighborhood school as a matter of law. 89 F.3d at 728. This holding is unsurprising, and not at odds with the Appellants' claims nor their requested relief. The record in *Urban* reflects that the student in question was being provided appropriate services in an alternative program at a non-neighborhood school, however, even that determination was predicated on consideration of the services available at the student's neighborhood school. Specifically, the administrative law judge noted that "the District should consider whether services available in Evergreen could be used for Gregory's IEP." *Id.* at 723. This is precisely the problem outlined in Appellants' *Amended Complaint*. SLCSD systematically fails to even consider what services are already available at neighborhood schools for E.J., H.S., and other students with intellectual and developmental disabilities. (JA.1:075-76 ¶¶181-193.)

The *Urban* court explicitly noted that their decision in *Urban* did *not* contradict their holding in *New Mexico Association for Retarded Citizens* where the court found that the state of New Mexico had failed to provide adequate educational services for children with disabilities, and specifically had "failed to

accommodate and integrate those handicapped children into physical education, vocational counseling, learning and personal guidance programs presently serving their nonhandicapped classmates." 678 F.2d 847, 855 (10th Cir. 1982). To the contrary, the Court in *Urban* reaffirmed that "[S]ection 504 requires accommodation in a neighborhood school when disabled children cannot receive educational benefits without accommodation." 89 F.3d at 728. Indeed, the language is clear that *Urban* does not stand for the proposition that no child can ever assert that they should be served in their neighborhood school regardless of claim or circumstance as the District Court suggests. In other words, *Urban* does not create an absolute bar to challenging a non-neighborhood school placement. Rather, while acknowledging that Section 504 would likely not require a school district to modify its program in order to serve a single child in one school, there may certainly be cases where a school district's discriminatory practice would, in fact, be required to modify its policy to accommodate children at neighborhood schools. *Id.*

### The Limitations Established by *Urban* and *Murray*

To be clear, Appellants have never requested that every "program" be created at every school in SLCSD. And that seems to be the limitation established by *Urban* and *Murray*. Programs are not required to be created so that every child can attend their neighborhood school – but neither do those cases establish a bar on

attending one's neighborhood school. *Murray*, 51 F.3d at 929; *Urban*, 89 F.3d at 728. And even if the location of a particular program cannot be challenged, it is always possible to challenge one's placement. *Id.* A particular student may not have a right to a particular outcome, but that is certainly different than saying no student has any right to access the process that would lead to their individualized outcome.

The District Court pointedly refused to contend with the discriminatory scheme actually asserted by Appellants, and instead held that their claims fail as a matter of law because they cannot "plead around" *Murray* and *Urban* by "requesting an order requiring the SLCSD to meaningfully consider providing services in the neighborhood schools rather than asserting a right to placement in a local school." (JA.1:245.) However, this characterization misses the point. The *Amended Complaint* makes clear that the school district does not, in fact, consider the individual needs of E.J., H.S. or any other child before subjecting them to the hub policy, but rather discriminates on the basis of the perceived severity of their disability category. (JA.1:045-46 ¶¶17-19; JA.1:050-51 ¶¶52,59; JA.1:059-61 ¶¶89-91,96; JA.1:064-65 ¶¶117,119; JA.1:068-71 ¶¶143-63; JA.1:074-75 ¶¶175-177,181; JA.1:078-79 ¶206.) The question is not whether the right to a particular facility or service is absolute, but whether the practice preventing access is discriminatory.

While *Urban* and *Murray* may stand for the proposition that any particular child does not have an absolute right to attend their neighborhood school, they similarly do not stand for the proposition there is an absolute bar to receiving special education services at a neighborhood school. In addition, neither of these cases contemplate a policy that disallows children with certain types of disabilities from attending neighborhood schools. This is precisely the type of policy that is apt for a challenge under antidiscrimination laws like the ADA and Rehabilitation Act.

In the present case, the school district has conflated program, location, and placement to mean the exact same thing. And the District Court's decision effectively allows that to be true.

### The District Court Did not Adequately Analyze Plaintiffs' Discrimination Claims Under the ADA.

Despite bringing a claim under the ADA, the District Court provided a perfunctory analysis of Appellants' arguments, and exclusively relied on sparse language in the *Urban* decision that "the ADA does not entitle [a disabled student] to attend his neighborhood school." (JA.1:244 (quoting *Urban*, 89 F.3d at 728).) After citing *Urban*, the District Court did not provide any additional analysis of the Appellants' specific claim that they had been subjected to a broad and discriminatory policy that denied them benefits offered to their non and otherwise disabled peers based solely on their disability categories. *Id.*

The Tenth Circuit has been clear that an independent analysis of claims of discrimination can still take place even when there are overlapping IDEA and ADA claims because to hold otherwise would allow state educational agencies to "openly discriminate" so long as the state also offered a FAPE in the LRE. *Ellenberg*, 478 F. 3d at 1282.

In *Ellenberg v. NMMI,* decided more than a decade after both *Urban* and *Murray*, this Court specifically clarified that because the IDEA is not a statute aimed at addressing or curing disability discrimination, it could certainly be the case that a student was educated in the least restrictive environment, but still subjected to discrimination under the ADA. *Id*. In *Ellenberg*, the parents of a student with behavioral diagnoses brought suit against the NMMI alleging violations of the IDEA, ADA and Rehab Act when their daughter was denied admittance, at least in part, due to factors related to her disability. *Id*. at 1272-73. While the Tenth Circuit ultimately dismissed the Ellenbergs' IDEA claims for failure to exhaust their administrative remedies, they remanded the case back to the district court on the ADA and Rehab Act claims. *Id.* at1282. In that instance, as in Appellants' case, the district court had affirmed a dismissal of the ADA claims citing the language in *Urban* that when the IDEA claims failed, the ADA and Rehab claims also failed. *Id.* at 1273. The Court noted that because the plaintiffs had alleged that NMMI's standards were facially discriminatory, the IDEA offered

no relief. *Id*. at 1280-81. In addition, the Court noted that the IDEA is "simply not an anti-discrimination statute," and that "[their] precedent does not hold that a party's discrimination claims under the Rehab Act and ADA must automatically be dismissed if an IDEA claim fails." *Id.* at 1281.

Like the Plaintiffs in *Ellenberg*, Appellants have alleged that they have been subjected to a facially discriminatory policy that denied them multiple benefits provided to their non and otherwise disabled peers, including but not limited to, 1) The same degree of school choice offered to their nondisabled peers (JA.1:045 ¶¶9-11,16), 2) Denial of any opportunity to attend school with their siblings and neighbors (JA.1:045 ¶¶8-11; JA.1:060 ¶94; JA.1:064 ¶118), 3) prolonged travel times to and from school (JA.1:061-62 ¶¶100,105; JA.1:073 ¶¶172-73), 4) denial of access to current programs offered throughout SLCSD, including resource classes, and push in/pull out services (JA.1:075-76 ¶¶186-93), 5) Failure to consider modifications to current programs or services that would provide them equal educational access (JA.1:076 ¶¶190-92,194-97), and 6) the benefit of individualized placement decisions under the IDEA. (JA.1:075, ¶¶181-85.) Notably, the vast majority of these alleged denials could be thought of in the same way the *Ellenberg* Court analyzed the denial of admittance to NMMI—as typical ADA claims that could be brought in other, non-educational settings.

**The Tenth Circuit Reviews Allegations of Facial Discrimination within Educational Systems Under Discrimination Statutes.**

As discussed *supra*, the Tenth Circuit noted in *Urban* that their ruling did not overrule or contradict their holding in *New Mexico Association for Retarded Citizens* where the Court found that the state of New Mexico had failed to provide adequate educational services for children with disabilities, and specifically had "failed to accommodate and integrate those handicapped children into physical education, vocational counseling, learning and personal guidance programs presently serving their nonhandicapped classmates." 678 F.2d 847, 855 (10th Cir. 1982). In that instance, the Tenth Circuit outlined that a case for discrimination under the Rehab Act could be made if:

> (1) the State's existing education programs preclude the handicapped from enjoying program benefits realized by the nonhandicapped; (2) program modification would result in the handicapped obtaining those benefits; and (3) program modification would not jeopardize the overall viability of the State's educational system.

*Id.*[7]

While the District Court provided no framework for analysis of Appellants' discrimination claims, Appellants' allegations meet all three prongs of the test outlined in *New Mexico Association for Retarded Citizens.* JA.1:244*; Id.* First, Appellants' *Amended Complaint* alleged that the hub system unnecessarily denied

---

[7] "Because the language of disability used in the ADA mirrors that in the Rehabilitation Act, we look to cases construing the Rehabilitation Act for guidance when faced with an ADA challenge." *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998).

them the benefits of consideration in a general education placement (JA.1:059-60 ¶¶89-91,94; JA.1:062-65 ¶¶103-104,106-109,115-16,119,122), attending neighborhood schools with their friends and siblings (JA.1:045 ¶¶8-11; JA.1:060 ¶94; JA.1:064-65 ¶118), reasonable travel time to and from school (JA.1:062 ¶105), and access to existing programs and services, including resource classes and push-in/pull-outs. (JA.1:045 ¶8; JA.1:050-51 ¶¶51-52,57,59; JA.1:059-67 ¶¶90,93-94,100,105,107-08,118-19,122-23,131-134; JA.1:069 ¶¶144-45; JA.1:071-73 ¶¶158,168,171-74; JA.1:075-76 ¶¶181,186-92.) Next, Appellants have asserted that modifications could be made to SLCSD's existing system that would allow them to receive these benefits—namely by abolishing the policy that disallows consideration of the full continuum of placements for children with intellectual disabilities and/or cognitive impairments and thus allowing these children access to general education placements through services already available across the District in their neighborhood schools, or by implementing itinerant teaching methods which have already been identified by the Utah State Board of Education utilizing existing resources. Lastly, because these services already exist and operate in neighborhood schools for students with other kinds of disabilities within the district, no harm will come from considering access for students with intellectual disabilities and/or cognitive impairments. Ultimately, the District Court failed to engage in the required analysis, and, when given appropriate consideration under

the relevant analysis, it is clear that Appellants' ADA claim should not have been dismissed.

**Failing to Appropriately Analyze Discrimination Claims Will Lead to Unchecked Discrimination Against Students with Disabilities**

While the District Court disposed of both the Plaintiff's IDEA and ADA claims in a singular analysis, the Tenth Circuit has required a distinct analysis of each claim even when overlapping themes occur. (JA.1:244-45); *Ellenburg* at 1282. As this Court noted in *Ellenburg,* this approach is critical to ensuring that public entities cannot wantonly discriminate against children with disabilities even if they meet their educational obligations under the IDEA. *Id.*

The logical outgrowth of the District Court's failure to analyze Appellants' ADA claim under discrimination caselaw permits similar schemes to proliferate. Consider a policy that all students who are deaf must be placed at a special school for the deaf, regardless of an individual student's ability, extent of hearing loss, use of lip reading, sign language interpretation, assistive technology, or a myriad of other services. Under this precedent a school district could simply state that other placements need not be considered because it had predetermined that a special school placement is necessary for all deaf children because that is where they best provide services. Similarly, a school district could implement a policy that all children with feeding tubes must be assigned to a home-bound placement, without regard for whether any particular student with a feeding tube actually required that

restrictive placement. Such policies may allow school districts to consolidate certain types of services, but those efficiencies are vastly outweighed by the separation and segregation that students with disabilities would suffer.

While the IDEA may allow districts to offer specialized or intensive services in particular locations, the ADA should prevent the implementation of any policy where all students in a singular disability group are categorically denied equal educational opportunities. As alleged in the *Amended Complaint*, SLCSD's hub system congregates students with intellectual disabilities and/or cognitive impairments for no other reason than their assigned disability category, and such a discriminatory scheme must be analyzed under the appropriate law.

### The District Court's Order Extends the Holdings in *Murray* and *Urban* in a Manner that is Inconsistent with Controlling Precedent

The District Court concluded that *Urban and Murray* are "not equivocal" such that all of Appellants' claims failed because no absolute right to attend a neighborhood school exists. (JA.1:244.) However, the District Court also acknowledged that Appellants did not request an absolute right to attend their neighborhood schools, but rather asked for individualized placement decisions to be made. *Id*. The District Court continued that this requested relief also failed because *Urban* precluded consideration of supplementary aids and services when an IEP requires placement in another school. *Id*. However, because the District Court did not analyze the facts in the *Amended Complaint* that allege it was

SLCSD's discriminatory hub policy, rather than any IEP, that required removal from general education placements in neighborhood schools, the effect of the decision may be quite expansive. (JA.1:241-45; JA.1:059-66 ¶¶89-90,93,96,107-109,116-17,119,121,122-23; JA.1:069-71 ¶¶144-45,154-55,158,163-64; JA.1:074-75 ¶¶176-77,179,181-85.) Without analyzing the hub policy's lack of individualization, and facially discriminatory components, the practical holding of the District Court's decision is that no child in Utah can ever challenge a more restrictive placement decision if part of their assertion is that they should have been placed in a general education setting at the school they would attend if not disabled. This is plainly incorrect under both Tenth Circuit and Supreme Court precedent.

Even in the wake of both *Urban* and *Murray*, the Court in *Ellenberg* emphasized the importance of looking to the IEP in determining disputes over the least restrictive environment. This Court specifically noted that they look to "[w]hether education in a regular classroom with the use of supplemental aids and services can be achieved satisfactorily, and 2) if not, if the school district has mainstreamed the child to the maximum extent appropriate." *Ellenberg*, 478 F. 3d at 1277. The District Court's application of *Urban* and *Murray* forecloses this vital analysis.

In addition, while not a case about placement and LRE, the Supreme Court has similarly highlighted that a student's IEP must be created in light of the specific child's circumstances and should be specially designed to meet a child's unique needs. *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 400 (2017). It follows that an IEP team in the SLCSD should not be foreclosed from considering a general education placement at a child's neighborhood school simply because it is not the way the District prefers to provide services to students with intellectual disabilities and/or cognitive impairments. Yet, the *Amended Complaint* plainly alleges this consideration remains out of reach for Appellants. For example, the *Amended Complaint* states clearly that E.J.'s IEP is specifically designed to provide services that can be delivered in a general education classroom, but the hub system prevents such consideration, because she must always be assigned to the "mild/moderate" special class rather than have the opportunity to succeed in a general education placement. (JA.1:062-63 ¶107.) Simply put, the District Court cannot sanction a scheme that does not allow for the educational processes guaranteed by the Tenth Circuit and the Supreme Court.

### The District Court Erred When It Failed to Acknowledge E.J. and H.S.'s Appeals of their Administrative Decisions

The *Amended Complaint* served as an appeal to E.J. and H.S.'s respective adverse IDEA administrative due process decisions. (JA.1:049 ¶¶40,47.) In Utah,

the only review available to a party after receiving an adverse due process decision is to file a civil action in state or federal court. (JA.1:047 ¶26.)

Curiously, the District Court on the one hand states that "the question of whether these predetermined hub placements deny the plaintiffs a free appropriate public education requires inquiry into the factual details of each particular child's case," while on the other hand wholly dismisses all of Appellants' claims without any consideration of the factual details of each "particular child's" case. (JA.1:241.)

Although the District Court found that E.J. and H.S. each had individual standing, having met the requirements of injury in fact and redressability, it failed to analyze their IDEA appeals, nor did it review their administrative records or even acknowledge E.J. or H.S.'s respective administrative appeals in its decision granting dismissal of all claims. (JA.1:232-35.)

The result of this failure is that both E.J. and H.S. have been prevented from having their individual placement decisions reviewed. This is illustrative of the harmful and far-reaching effect of the District Court's decision in this case – if E.J. and H.S., individual named Appellants with standing, are barred from an individualized analysis even after properly employing the process afforded under the law, it is difficult to see how any student could ever challenge a potentially inappropriate and discriminatory placement.

Regardless of the outcome of the other claims at the Motion to Dismiss stage, E.J. and H.S.'s individual IDEA inquiries should have proceeded.

### The District Court Erred in Finding Appellants' Section 504 Claim Does not Qualify as a Systemic Violation and is Therefore not Exempt from Exhaustion

Contrary to the District Court's finding that Appellants' Section 504 claim does "not qualify for the systemic failure exception to the exhaustion requirement," the underlying violations alleged by Appellants are in fact systemic in nature and cannot be remedied through the IDEA, rendering exhaustion futile and thereby triggering the systemic exception to the exhaustion requirement. (JA.1:241.)

In *Romer*, the Tenth Circuit clarified that the "the underlying purposes of exhaustion would not be served" by requiring exhaustion where the alleged systemic violation(s) "raise only questions of law, thereby rendering agency expertise and the factual development of an administrative record less important." *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1044 (10th Cir. 1993).

But the District Court opines that "the systemic failure exception does not apply to the plaintiffs in this case because they 'do not target structural…concerns, but rather the effect of a single component of [the SLCSD's] educational program on individual children's' individualized education programs," and that this is further demonstrated because inquiry into the factual details of each student's case is required to determine "whether these predetermined hub placements deny the

plaintiffs a free appropriate public education." (JA.1:240-41 (quoting *Romer*, 992 F.2d at 1044).). Through this framing, the District Court appears to determine that Appellants' Section 504 claim seeks relief that implicates FAPE and could have been remedied by the IDEA. But a claim is not subject to exhaustion merely because it involves educational programming. Were that the case, it would be functionally impossible for a student plaintiff to ever satisfy the systemic exception in a case against a public school district, as every possible claim a student could bring against their school district would necessarily involve educational programming in some way, whether directly or indirectly.

Here, the Section 504 claims may implicate FAPE, but they are more aptly described as discrimination claims because they allege that the District is subjecting students with intellectual disabilities and/or cognitive impairments to substandard and unequal services and educational opportunities. In *Ellenberg v. NMMI*, the Tenth Circuit made clear that the IDEA is not an antidiscrimination statute, and such an administrative process would not "offer insight into the merits of a discrimination claim." 478 F. 3d at 1275, 1280-81. Further, exemptions to exhaustion in such cases ultimately "prevent[] inefficiency and waste of judicial resources." *Id.* at 1281. It would therefore make little sense to subject Appellants' discrimination claims to a process that was never intended to address them.

The Supreme Court has emphatically clarified in two unanimous decisions that exhaustion is not required wherein the requested relief is simply unavailable under the IDEA's administrative process. *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154 (2017); *Luna Perez v. Sturgis Pub. Sch.* 598 U.S. 142, 150 (2023). The correct standard for analyzing whether a non-IDEA claim in a school-related case is subject to the exhaustion requirement was articulated by the Supreme Court in *Fry v. Napoleon Community Schools*: "[I]n determining whether a suit seeks relief for such a denial [of FAPE], a court should look to the substance, or gravamen, of the plaintiff's complaint." 580 U.S. at 165. In *Fry*, the Supreme Court rejects the idea that any claim which involves a student's education in some way is automatically subject to exhaustion, applying the example of a hypothetical student who uses a wheelchair:

> Suppose first that a wheelchair-bound child sues his school for discrimination under Title II (again, without mentioning the denial of a FAPE) because the building lacks access ramps. In some sense, that architectural feature has educational consequences, and a different lawsuit might have alleged that it violates the IDEA: After all, if the child cannot get inside the school, he cannot receive instruction there.

*Id.* at 171. From this, the Court concludes "[c]onsider that the child could file the same basic complaint if a municipal library or theater had no ramps…That the claim can stay the same in those alternative scenarios suggests that its essence is equality of access to public facilities, not adequacy of special education." *Id.* at

172. It is abundantly clear that the Supreme Court did not intend to extend the IDEA's exhaustion requirement broadly to every non-IDEA claim which involves educational programming, despite the District Court's finding otherwise.

The core distinction is that IDEA claims rely extensively on the unique circumstances of individual students and therefore require a "factually intensive inquiry" with respect to individual cases, whereas true systemic claims present a "purely legal question" which can be answered as to any student in any school district. *Romer*, 992 F.2d at 1044. In other words, a claim which does meet the standard, such as one for failure to provide ramps at school buildings, would be essentially the same for any student with the same type of disability, regardless of their individual circumstances – while the outcome of a claim grounded in FAPE under IDEA necessarily turns on the highly specific situation of an individual student or students.

In *Perez v. Sturgis*, the Supreme Court confirmed the principle first expressed in *Fry*: that a plaintiff is not required to "exhaust administrative processes under IDEA that cannot supply what he seeks." 598 U.S. at 150. In *Perez*, the Court made clear that this applies even to relief based on past allegations of a denial of FAPE, if such relief is not available under the IDEA. *Id.* at 149-50.

Because the due process procedures available under the IDEA are by nature designed to address FAPE issues with respect to an individual student, a plaintiff

cannot raise systemic concerns in a due process hearing except as they pertain to the individual student in question. This is of course why exhaustion is considered futile with respect to systemic violations. E.J. and H.S. have been categorically denied both the opportunity to be placed in general education as well as the opportunity to attend their neighborhood schools with special education services, not because they cannot receive a FAPE there but because SLCSD's system forecloses the possibility at the outset. In other words, this case would never have arisen if not for a system-wide policy, and the violations asserted cannot be remedied without systemic relief. Remedying SLCSD's discriminatory hub school system is not a type of relief available through the IDEA's individual administrative process.

Here, the Hearing Officers in both H.S. and E.J.'s due process hearings unequivocally stated that they lacked jurisdiction to review systemic claims under the ADA, and that the IDEA did not allow them to review systemic claims on behalf of other students. (JA.1:016; JA.1:035.) Further, the Hearing Officer in E.J.'s case refused to allow evidence or discussion of the hub system's effect on E.J.'s placement. (JA.1:048 ¶¶35-36.) As a result, she was barred from presenting the relevant information regarding her IDEA claims. Given that two different Hearing Officers found that they could not review Appellants' discrimination claims under the ADA, a statute nearly identical to Section 504, it defies reason to

assert that Appellants' Section 504 claims would have fared any differently. This further confirms the truly systemic nature of Plaintiffs' Section 504 claim as well as the inadequacy of the IDEA's administrative process to resolve discrimination claims or provide the requested systemic relief.

Because the hub school plan affects all SLCSD students in the same disability category in the same way, the circumstances in this case therefore more closely resemble that of the hypothetical wheelchair user in *Fry*, which the Supreme Court offered as an example of a "purely legal question." (JA.1:070-71 ¶¶152-56,158; JA.1:075 ¶¶181-83.) 580 U.S. at 171-172. For the purposes of Appellants' Section 504 claim, the specific students E.J. and H.S. could be swapped with any of the hundreds of other students with cognitive disabilities in the District who, like E.J. and H.S., had their educational futures simultaneously dictated when the District announced its hub school plan in March 2019, and the underlying facts would not change. As for E.J. and other students who were already enrolled in the district at the time the plan was announced, these students were concurrently reassigned to hub schools and had new placements predetermined months before IEP meetings were ever held. (JA.1:060 ¶93; JA.1:071 ¶¶158-64.)

Students without intellectual disabilities and/or cognitive impairments have the option to receive services at their neighborhood school via a resource model in

a general education placement. (JA.1:067 ¶131; JA.1:075-76 ¶¶186-187,190; JA.1:079 ¶207.) They are permitted to use existing services such as push ins, pull outs, and other related services that allow a student to be appropriately served in a general education placement. (JA.1:077-77 ¶¶188-190; JA.1:079 ¶207.) However, students with intellectual disabilities and/or cognitive impairments are barred access to these services even though they are readily available at the neighborhood schools. (JA.1:067 ¶131; JA.1:075-76 ¶¶186-187,191; JA.1:079 ¶207.) Instead, they are preassigned to a special class placement at a segregated hub school and removed from the general education environment in their neighborhood school. (JA.1:060 ¶95; JA.1:064 ¶116; JA.1:067 ¶¶133-34.)

Like *Fry*'s hypothetical wheelchair user, Appellants are simply barred access to existing benefits based on the nature of their disability – the former because they require a ramp, and the latter because they require a change in policy. Accordingly, Appellants have pled a systemic violation for which exhaustion would be futile, and the District Court erred in dismissing the Section 504 claim for failure to exhaust administrative remedies.

## Conclusion

For the foregoing reasons, this Court should find that *Urban* and *Murray* do not preclude Appellants' requested relief and reverse the dismissal of each of Appellants' claims.

## Statement of Counsel as to Oral Argument

Appellants respectfully request oral argument to assist the Court in determining how the District Court artificially narrowed the requested relief and misapplied Tenth Circuit precedent in dismissing Appellants' claims. Oral argument will likely be necessary to allow counsel to assist the Court regarding the overlapping legal frameworks of the IDEA, ADA and Rehab Act at issue in this case.

September 22, 2023

*/s Laura Henrie*
Laura Henrie
Michelle Marquis
Katie Cox
Maya V. Anderson
Disability Law Center
960 South Main Street
Salt Lake City, Utah 84101
(801) 363-1347
lhenrie@disabilitylawcenter.org
mmarquis@disabilitylawcenter.org
kcox@disabilitylawcenter.org
mvanderson@disabilitylawcenter.org

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements**

1. This document complies with type-volume limitation of Fed. R.
App. P. 32(a)(7) because this brief contains 12,665 words, excluding the parts of
the document exempted by Fed. R. App. P. 32(f).

2. This document complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:
this brief has been prepared in a proportionally space typeface using Microsoft
365 Word Version 2308 in a 14-point Times New Roman font.

September 22, 2023

*/s Laura Henrie*
Laura Henrie
Michelle Marquis
Katie Cox
Maya V. Anderson
Disability Law Center
960 South Main Street
Salt Lake City, Utah 84101
(801) 363-1347
lhenrie@disabilitylawcenter.org
mmarquis@disabilitylawcenter.org
kcox@disabilitylawcenter.org
mvanderson@disabilitylawcenter.org

*Attorneys for Appellants*

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Webroot Endpoint Protection CE 23.3© 2006-2023 (updated September 22, 2023), and according to the program are free of viruses.

September 22, 2023

*s/ Laura Henrie*
Laura Henrie
Disability Law Center
Attorney for Appellants

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of September, I electronically filed the foregoing *Brief of Appellants* using the court's CM/ECF system which will send notification of such filing to the following:

Joan M. Andrews
jandrews@fabianvancott.com

Matthew S. Brahana
mbrahana@fabianvancott.com

*s/ Laura Henrie*
Laura Henrie
Disability Law Center
Attorney for Appellants

No. 23-4058

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

KRISTIN JACOBS, legal guardian of E.J.;
AMANDA SANDY, legal guardian of H.S.;
AND DISABILITY LAW CENTER,
Plaintiffs-Appellants,
v.
SALT LAKE CITY SCHOOL DISTRICT;
and BOARD OF EDUCATION OF SALT
LAKE CITY SCHOOLS,
Defendants-Appellees.

_____

On appeal from the United States District Court, District of Utah,
Honorable Jill N. Parrish, No. 2:21-cv-00706-JNP-CMR

_____

## ATTACHMENT A

Docket No. 50 Memorandum Decision and Order Filed 3/31/2023

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KRISTIN JACOBS, legal guardian of E.J.; AMANDA SANDY, legal guardian of H.S.; and DISABILITY LAW CENTER;<br><br>   Plaintiffs,<br><br>v.<br><br>SALT LAKE CITY SCHOOL DISTRICT and BOARD OF EDUCATION OF SALT LAKE CITY SCHOOLS,<br><br>   Defendants. | MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS<br><br>Case No. 2:21-cv-00706-JNP-CMR<br><br>District Judge Jill N. Parrish |

Before the court is a motion to dismiss filed by the Salt Lake City School District (SLCSD) and the Board of Education of Salt Lake City Schools (collectively, the defendants). ECF No. 32. The court GRANTS the motion and dismisses the action brought by plaintiffs E.J., H.S. and the Disability Law Center (DLC).

## BACKGROUND[1]

In the Spring of 2019, the SLCSD announced that special education services for students with cognitive disabilities would be provided in a handful of "hub" schools. E.J. is a student in the school district who has been categorized as having a "mild/moderate" cognitive disability. The school district informed E.J.'s parents that special education services would be provided to E.J. at one of the hub schools. E.J.'s parents requested that she receive special education services in her

---

[1] The court recites the facts based on the allegations of the Amended Complaint.

neighborhood school so that she could attend school with her sister and other children in her neighborhood. The SLCSD told E.J.'s parents that E.J. would have to go to a hub school in order to receive special education services and that if she attended her neighborhood school, those services would be reduced or removed. E.J.'s parents agreed to send their daughter to the hub school in order to receive special education services.

H.S. is also a student in the SLCSD.  He began attending his neighborhood school in August 2019. In September 2019, the school district informed H.S.'s parents that it had categorized H.S. as having a severe cognitive disability and that he needed to be transferred to a hub school to participate in an educational program designed for his disability level. When H.S. parents objected to moving their son to a hub school, the SLCSD terminated the limited services the district had been providing to H.S. He continued to attend his neighborhood school without receiving any special education services.

The parents of E.J. and H.S. wrote letters to the defendants requesting due process hearings. In these letters, the parents raised concerns that the SLCSD's hub system improperly removed students like E.J. and H.S. from their neighborhood schools and isolated them from their nondisabled neighborhood peers. Accordingly, the parents asserted that the hub system violated the rights of E.J. and H.S. under Title II of the Americans with Disabilities Act (ADA) and under the Individuals with Disabilities Education Act (IDEA). The parents exhausted the administrative remedies for E.J.'s and H.S.'s ADA and IDEA claims by raising these arguments in the due process hearings with the SLCSD.

The DLC is a nonprofit corporation that has been designated as Utah's protection and advocacy system. It is a federally authorized and funded organization established under the Protection and Advocacy for Individuals with Developmental Disabilities Act. The DLC advocates

for and protects the legal rights of disabled individuals in Utah. In December 2021, E.J., H.S., and the DLC filed a lawsuit against the defendants. Asserting claims under (1) Title II of the ADA, (2) Section 504 of the Rehabilitation Act (Section 504), and (3) the IDEA, the plaintiffs ask the court to order the defendants to make individualized placement decisions for E.J. and H.S. and to meaningfully consider providing special education services to them in their neighborhood schools.

ANALYSIS

The defendants move to dismiss the claims against them for three reasons. First, the defendants argue that the court should dismiss this action under Rule 12(b)(1) of the Federal Rules of Civil Procedure because the plaintiffs lack standing to bring this lawsuit. Second, they argue that the court should dismiss the Section 504 claim because the plaintiffs failed to exhaust their administrative remedies. Third, the defendants argue that the court should dismiss the action under Rule 12(b)(6) because the relief requested by the plaintiffs is not available to them.

## I.     STANDING

Article III of the Constitution limits a federal court's authority to resolve legal claims to actual cases or controversies. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). This constitutional limitation on a federal court's subject-matter jurisdiction requires courts to ascertain whether a plaintiff has standing to sue. *See id.* at 338. "[T]he 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id*. (citation omitted).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, the plaintiff must 'clearly allege facts demonstrating' each element." *Spokeo*, 578 U.S. at 338 (cleaned up) (citation

3

omitted). Because the defendants have mounted a facial attack to the plaintiffs' standing to sue, the court assumes that the factual allegations of the operative complaint are true and considers whether these facts are sufficient to establish jurisdiction. *See Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020). The defendants argue that the allegations in the Amended Complaint do not establish the elements of standing for either the individual defendants—E.J. and H.S.—or the DLC.

A.     *E.J. and H.S.*

The defendants assert that E.J. and H.S. have not satisfied either the injury in fact or the redressability requirements for standing.

1)     Injury in Fact

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (citation omitted). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (Citation omitted). For an injury to be concrete it must real rather than abstract. *Id*. at 340. The defendants argue that E.J. and H.S. have not pled facts showing they have suffered concrete and particularized injuries. The court disagrees.

E.J. alleges that because the SLCSD rigidly enforces its hub system for providing special education services, she must get up earlier, spend significantly more time on a bus to reach her school, and is denied the opportunity to walk home from school with her sister and neighborhood friends. She further alleges that the hub school that she attends is detrimental to her education because she is negatively impacted by maladaptive modeling and bullying by her classmates and is denied the opportunity to associate with her nondisabled neighborhood peers while at school.

4

H.S. also alleges that he is harmed by the SLCSD's inflexible enforcement of the hub system. When his parents declined to transfer H.S. to a designated hub school, the district terminated the limited special education services that had been provided to him in his neighborhood school. Thus, the SLCSD has declined to provide any special education services to H.S.

Both E.J. and H.S. have alleged concrete harms that affect them in their individual capacities. Accordingly, they have easily satisfied the injury in fact requirement of standing.

2)      Redressability

In addition to showing an injury in fact, E.J. and H.S. must also establish that their injuries would likely be redressed by a favorable judicial decision. The individual plaintiffs argue that they have satisfied the redressability requirement because they are requesting an injunction that would require the SLCSD to make individualized placement decisions for them. E.J. and H.S. further contend that if the SLCSD is ordered to make individualized decisions, the district will likely allow them to receive special education services in their neighborhood schools, alleviating the harms alleged in their complaint.

Incorporating their Rule 12(b)(6) argument that the plaintiffs' action should be dismissed for failure to state a claim, the defendants argue that the individual plaintiffs' alleged injuries are not redressable because their claims fail as a matter of law. *See Urban v. Jefferson Cnty. Sch. Dist.*, 89 F.3d 720, 727 (10th Cir. 1996) ("[T]he IDEA does not give [students] a right to a placement at a neighborhood school."). But "[i]n most cases, a plaintiff's failure to state a claim under Rule 12(b)(6) does not deprive a federal court of subject-matter jurisdiction." *Brownback v. King*, 141 S. Ct. 740, 749 (2021). "[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate

5

the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *accord Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . .").

"Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Steel Co.*, 523 U.S. at 89 (citation omitted). The defendants, however, do not argue that the plaintiffs' claims are so insubstantial or implausible as to deprive this court of jurisdiction. Indeed, the plaintiffs at least plausibly argue that the Tenth Circuit authorities cited by the defendants do not apply here because they seek an individualized determination rather than an absolute right to be educated in their neighborhood schools. Accordingly, the court finds that the plaintiffs' claims are not so devoid of merit to deprive the court of subject-matter jurisdiction.

In short, the defendants may not incorporate their 12(b)(6) arguments into the redressability element of the test for standing. The standard for redressability presumes that the plaintiffs will prevail on their claims and simply tests whether the court may grant relief that will address the claimed harm. *See Spokeo*, 578 U.S. at 338 (an injury is redressable if it "is likely to be redressed by a favorable judicial decision.") Because the injunctive relief requested by the individual defendants, should they prevail, would likely redress their alleged injuries, the court finds that E.J. and H.S. have met this standard.

Next, the defendants argue that H.S.'s injuries are not redressable because his parents declined to receive special educations services in a hub school and he has not alleged that his parents will consent to services in the future. But the objective of this action is to force the SLCSD to consider providing special education services to H.S. in his neighborhood school. The prayer

6

JA 234

for relief clearly implies that H.S.'s parents would consent to services if provided to him in his local school.

Finally,  the defendants contend that E.J.'s injuries are not redressable because she was in the sixth grade for the 2021-2022 school year and the complaint does not allege that the SLCSD employs the hub system for subsequent grade levels. This argument fails because it improperly conflates the standing doctrine with the mootness doctrine. "The plaintiff bears the burden to establish standing at the time the suit is filed, and if the defendant's offending conduct has ceased by that time, we dismiss for lack of redressability." *WildEarth Guardians v. Pub. Serv. Co. of Colorado*, 690 F.3d 1174, 1185 (10th Cir. 2012). "But if the offending conduct ceases after the suit is filed, the defendant must establish mootness by showing that its offending conduct 'could not reasonably be expected to recur.'" *Id.* at 1185–86 (citation omitted). Here, the defendants are asserting a mootness argument by suggesting that events that may have occurred after the complaint was filed could have mooted E.J.'s claims because she would no longer subject to the SLCSD's hub system. But the defendants cannot mount a mootness challenge by pointing to deficiencies in the complaint because plaintiffs need only plead facts showing standing at the time that they initiated the lawsuit. The defendants have the burden of producing evidence that subsequent events rendered E.J.'s claims moot. Because the defendants have not shouldered this burden, their mootness argument fails.

3)      Conclusion

The court rejects the defendants' arguments that E.J. and H.S. do not have standing to sue. Thus, the court denies the defendants' motion to dismiss the individual plaintiffs' claims for lack of jurisdiction.

B.      *The DLC*

Unlike E.J. and H.S., the DLC was not directly affected by the SLCSD's hub system. The DLC argues that it nonetheless has standing to sue in its own name under two distinct theories: statutory standing and associational standing.[2] Although the DLC articulates these two theories as independent paths to standing, caselaw shows that they are intertwined.

First, the DLC argues that Congress has authorized it to sue on behalf of disabled individuals in Utah. The DLC alleges that it is a federally funded organization established under the Developmental Disabilities Assistance and Bill of Rights Act. Under this Act, Congress has authorized the DLC to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of [individuals with developmental disabilities] within [Utah] who are or who may be eligible for treatment, services, or habilitation." 42 U.S.C. § 15043(a)(2)(A)(i). The DLC asserts that this statutory grant of authority to pursue legal claims on behalf of disabled Utahns satisfies the standing requirement.

The DLC's statutory standing argument is only half-right. Although Congress may eliminate prudential standing rules by granting an express right of action, it may not abolish constitutional standing requirements. *Warth*, 422 U.S. at 501. Because the statutory authorization to sue does not resolve the question of whether the DLC has Article III standing to sue, it may not satisfy its burden to show that it has standing simply by referring to a congressional grant of a right to sue.

─────────────────────

[2] The DLC also argues that it has organizational standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Because the court finds that the DLC has associational standing, the court need not address this argument.

This statutory authorization, however, is relevant to the DLC's argument that it has associational standing. Under this theory,

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The first and second requirements of the *Hunt* test are constitutional in nature, while the third is prudential. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–56 (1996). Thus, where Congress has eliminated prudential barriers to standing by granting an organization the right to sue on behalf of others, the organization need only satisfy the first two requirements of the *Hunt* test rather than all three. *Id.* at 556–58; *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1112–13 (9th Cir. 2003) ("We hold that in light of the role Congress assigned by statute to advocacy organizations such as OAC [to sue on behalf of individuals with a mental illness], Congress abrogated the third prong of the *Hunt* test.").

To determine whether the DLC has associational standing in this case, the court need only decide (1) whether at least one individual within the scope of its statutory mandate has standing to sue[3] and (2) whether the interests at issue in the lawsuit are germane to the DLC's purpose. As

---

[3] In the *Hunt* case, the Supreme Court analyzed associational standing in the context of members of an organization. Of course, E.J. and H.S. are not members of the DLC in the sense that they or their parents chose to affiliate with it, contribute money to finance its operations, or vote for its leadership. But this is not fatal to the DLC's associational standing. The prohibition against suing to vindicate the rights of another is a prudential rule rather than a constitutional one. *United Food*, 517 U.S. at 557. Congress has eliminated this prudential obstacle to standing by authorizing the DLC to sue on behalf of disabled individuals who reside in Utah. *See Oregon Advoc. Ctr.*, 322 F.3d at 1110–12.

discussed above, E.J. and H.S. have Article III standing, satisfying the first requirement. And this lawsuit to require the SLCSD to make individualized determinations as to where to educate mentally disable children is germane to the DLC's mission of advocating for the rights of disabled Utahns. The SLCSD argues at some length that the DLC is unable to satisfy the third *Hunt* requirement: that the lawsuit may not require the participation of individual constituents. But, as discussed above, the DLC need not satisfy this third requirement. Because the DLC has satisfied the first two *Hunt* requirements, it has shown that it has standing to sue. The court denies the defendants' motion to dismiss it for lack of subject-matter jurisdiction.

## II.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

Before filing a lawsuit that seeks the same relief available under the IDEA, a litigant must exhaust his or her administrative remedies. 20 U.S.C. § 1415(l); *Luna Perez v. Sturgis Pub. Sch.*, No. 21-887, 2023 WL 2575928, at *3 (U.S. Mar. 21, 2023). The plaintiffs exhausted their administrative remedies for the IDEA and ADA claims, but not for their Section 504 claim. Because their Section 504 claim seeks the same relief available under the IDEA, the plaintiffs concede that § 1415(l) requires them to exhaust their administrative remedies for this claim and that they failed to do so. "[J]udicial review is normally not available . . . until all administrative proceedings are completed . . . ." *Honig v. Doe*, 484 U.S. 305, 326–27 (1988). The plaintiffs argue, however, that their failure to exhaust is excused by the systematic failure exception to the exhaustion requirement.

"Parents may bypass the administrative process where exhaustion would be futile or inadequate." *Id.* at 327. "Administrative remedies are generally inadequate or futile where plaintiffs allege structural or systemic failure and seek systemwide reforms." *Ass'n for Cmty. Living v. Romer*, 992 F.2d 1040, 1044 (10th Cir. 1993). A challenge to a policy that affects all

10

students does not automatically excuse exhaustion under the systemic failure exception. *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1304 (9th Cir. 1992). In order to be systemic, the alleged violation must be "so serious and pervasive that basic statutory goals are threatened." *Id.* The Tenth Circuit, for example, found that exhaustion was excused where the plaintiffs alleged that the entire special education system offered by the State of New Mexico was infirm. *N. M. Ass'n for Retarded Citizens v. New Mexico*, 678 F.2d 847, 851 (10th Cir. 1982).

In a case similar to this one, an advocacy group sued the Colorado Department of Education (CDE), claiming that the department had deprived disabled children of a free appropriate public education and appropriately individualized education programs because the department's policies "arbitrarily predetermine the duration of [extended school day] and [extended school year] services and use a single criterion to determine eligibility for [extended school year] services." *Romer,* 992 F.2d at 1043. The advocacy group failed to exhaust its administrative remedies. The Tenth Circuit held that the systematic failure exception did not excuse the exhaustion requirement because "[t]he violations alleged and relief requested in this case. . . do not target structural or due process concerns, but rather the effect of a single component of CDE's educational program on individual children's [individualized education programs]." *Id.* at 1044. "This is not the kind of systemic violation that renders the exhaustion requirement inadequate or futile, and framing a complaint as a class action challenge to a general policy does not convert it into one." *Id.* Moreover, allegations "that CDE's policies arbitrarily predetermine the duration of [extended school day] and [extended school year] services" did not trigger the systemic failure exception because these allegations "ultimately require[d] a determination as to whether any individual child was denied a free appropriate public education." *Id.* at 1045.

11

Other circuits have reached similar conclusions. The Ninth Circuit, for example, held that a plaintiff who brought a class action challenging a school district's policies regarding extended school year services for children with disabilities was required to exhaust administrative remedies. *Hoeft*, 967 F.2d at 1304. The court held that the alleged violations were not systemic in nature, reasoning that "[s]tructuring a complaint as a challenge to policies, rather than as a challenge to an individualized education program formulated pursuant to these policies . . . does not suffice to establish entitlement to a waiver of the IDEA's exhaustion requirement." *Id*. The Third Circuit came to the same conclusion in a case similar to this one. The plaintiffs in that case alleged violations of Section 504 because the school district "failed to individually consider . . . educational placements" of kindergarteners with special needs and instead used a "blanket rule" to place the students in special classes "without consideration of educating them in their 'neighborhood' school." *J.T. v. Dumont Pub. Schs*, 533 F. App'x 44, 49 (3d Cir. 2013) (unpublished). Because the claim "addresse[d] only one component of the school district's education program," and because resolving the claim required a "factually intensive inquiry into the circumstances of each individual child's case," the court held that the systematic exception did not apply. *Id.* at 54-55.

The plaintiffs argue that because their Section 504 claim challenges a systematic failure, exhaustion of administrative remedies is not required. Much like the plaintiff in *Romer,* the plaintiffs in this case assert that the SLCSD's predetermination of a child's placement into a hub school based on a single criterion (IQ score) is a systematic violation of rights that affects all students with a cognitive disability because it denies them individualized education programs. As in *Romer*, the systematic failure exception does not apply to the plaintiffs in this case because they "do not target structural . . . concerns, but rather the effect of a single component of [the SLCSD's] educational program on individual children's" individualized education programs. *Romer,* 992

12

F.2d at 1044. Additionally, the question of whether these predetermined hub placements deny the plaintiffs a free appropriate public education requires inquiry into the factual details of each particular child's case, further demonstrating that the systematic failure exception does not apply.

In short, the court finds that the plaintiffs do not qualify for the systematic failure exception to the exhaustion requirement. The court, therefore, dismisses the Section 504 claim without prejudice for failure to exhaust administrative remedies.

## III.    RULE 12(b)(6) MOTION TO DISMISS

The defendants argue that the plaintiffs' remaining claims under the IDEA and the ADA should be dismissed under Rule 12(b)(6), which provides that a court may dismiss a complaint if it fails "to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).

The plaintiffs allege that the defendants violated their rights under the IDEA. The IDEA "offers States federal funds to assist in educating children with disabilities." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017). "In exchange for the funds, a State pledges to comply with a number of statutory conditions. Among them, the State must provide a free appropriate public education . . . to all eligible children." *Id.* "A State covered by the IDEA must provide a disabled child with . . . special education and related services 'in conformity with the [child's] individualized education program' . . ." *Id.* at 390–91 (second alteration in original) (quoting 20 U.S.C. § 1401(9)(D)). An individualized education program

13

> is a written statement of (1) the child's present performance level,
> (2) the goals and instructional objectives to be attained, (3) the
> specific educational services to be provided, (4) the child's needed
> transition services, (5) the projected dates for initiation and
> completion of such services, and (6) the criteria and procedures to
> be used to assess progress toward the instructional objectives.

*Urban ex rel. Urban v. Jefferson Cnty. Sch. Dist. R-1*, 89 F.3d 720, 722 (10th Cir. 1996).

Additionally, a child's free appropriate public education should be provided in the least restrictive environment necessary for the child to receive an appropriate education. 20 U.S.C. § 1412(a)(5). At the end of the day, the IDEA "guarantees a substantively adequate program of education to all eligible children." *Endrew F.*, 580 U.S. at 394. This requirement is satisfied if a child's individualized education program is "reasonably calculated to enable the child to receive educational benefits." *Id.* (citation omitted).

The plaintiffs also claim that the defendants violated the ADA. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Regulations promulgated under the ADA forbid public entities such as [school districts] from denying a disabled person 'the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities.'" *Urban*, 89 F.3d at 727.

The crux of the plaintiffs' claims under both the IDEA and the ADA is that the SLCSD's hub policy violates the protections afforded by these statutes because the district's placement decisions are not individualized. According to the plaintiffs, the IDEA and the ADA require the district to meaningfully consider providing special education services to disabled students in their

neighborhood schools when formulating their individualized education programs. The plaintiffs ask the court to order the SLCSD to reconsider their individualized education programs and determine whether they can receive special education services in their local schools.

The plaintiffs' claims are foreclosed by Tenth Circuit precedent. In *Murray ex rel. Murray v. Montrose County School District RE-1J,* 51 F.3d 921, 923–25 (10th Cir. 1995), a student with disabilities sued his school district under the IDEA, challenging the district's decision to move him from his neighborhood school to a school with a program for children with severe disabilities. The plaintiff argued that the least-restrictive-environment provision of the IDEA "includes a presumption that the [least restrictive environment] is in the neighborhood school with supplementary aids and services." *Id.* at 928. The Tenth Circuit disagreed and instead held that "the [least-restrictive-environment] mandate does not include a presumption of neighborhood schooling, and a school district accordingly is not obligated to fully explore supplementary aids and services before removing a child from a neighborhood school." *Id.* at 930.

The Tenth Circuit expanded on *Murray* in *Urban ex rel. Urban v. Jefferson County School District R-1*, 89 F.3d 720 (10th Cir. 1996). In that case, the school district placed a developmentally disabled student in school with a specialized program rather than his neighborhood school. *Id.* at 722–23. The student sued the school district, arguing that the IDEA and the ADA required the district to place him in his neighborhood high school because it was the least restrictive environment. *Id.* at 726. The Tenth Circuit ruled that "the IDEA does not give [the plaintiff] a right to a placement at a neighborhood school." *Id.* at 727. Instead, the IDEA only entitles a student to an appropriate education, and the school district "satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally

from that instruction." *Id.* The court also held "that the ADA does not entitle [the plaintiff] to attend his neighborhood school." *Id.* at 728.

The plaintiffs argue that *Murray* and *Urban* do not defeat their claims because they do not assert an absolute right to receive special education services in their neighborhood school. Instead, they request an individualized placement decision that includes meaningful consideration of permitting E.J. and H.S. to receive special education services in their neighborhood school. *Murray*, however, forecloses this argument. In that case, the Tenth Circuit held that if a student's individualized education program calls for placement in another school in order to receive specialized services, a school district "is not obligated to fully explore supplementary aids and services before removing a child from a neighborhood school." *Murray*, 51 F.3d at 930. Because the school district did not have an obligation to consider proving supplementary services in a neighborhood school, the Tenth Circuit did not review the district's decision to educate the student in another school. *Id.* Similarly, *Urban* held that Section 504 "does not require a school district to modify its program in order to accommodate a single child in a neighborhood school, especially if that child is already receiving educational benefits in another environment." 89 F.3d at 728. Based on this analysis of Section 504 and that court's prior "holding in *Murray* that a disabled child does not have a right to attend her neighborhood school," the *Urban* court ruled "that the ADA does not entitle [a disabled student] to attend his neighborhood school." *Id.*

In sum, the holdings of *Murray* and *Urban* were not equivocal. These precedents do not leave the door open for this court to find that the IDEA or the ADA requires the SLCSD to make individualized determinations as to where special education services should be provided. If a school district has established a system to provide special education services in specific locations, it is not required to consider providing specialized services in neighborhood schools on a case-by-

16

JA 244

case basis or to modify its program to accommodate the location preferences of individual students. The plaintiffs cannot plead around *Murray* and *Urban* by requesting an order requiring the SLCSD to meaningfully consider providing services in neighborhood schools rather than asserting a right to placement in a local school. Accordingly, the court finds that the plaintiffs' IDEA and ADA claims fail as a matter of law and grants the SLCSD's motion to dismiss these claims.[4]

## CONCLUSION

For the above-stated reasons, the court grants the defendants' motion to dismiss. The court dismisses the plaintiffs' Section 504 claim without prejudice for failure to exhaust administrative remedies. The court dismisses the plaintiffs' IDEA and ADA claims for failure to state a claim upon which relief can be granted.

DATED March 31, 2023.

BY THE COURT

Jill N. Parrish
United States District Court Judge

---

[4] At oral argument, the plaintiffs argued that the SLCSD had also violated E.J.'s rights by not adequately integrating her with her nondisabled peers in her hub school. But E.J. has not raised this claim in the Amended Complaint or in the briefing on this motion to dismiss. The relief sought by E.J. in this action was limited to injunctive relief requiring the SLCSD to make an individualized determination as to whether to offer E.J. special education service in her neighborhood school. Accordingly, the court makes no determination regarding the adequacy of the services offered in the hub school. The court's dismissal of E.J.'s claims is without prejudice to her ability to challenge the adequacy of those services in a subsequent lawsuit.

No. 23-4058

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————

KRISTIN JACOBS, legal guardian of E.J.;
AMANDA SANDY, legal guardian of H.S.;
AND DISABILITY LAW CENTER,
Plaintiffs-Appellants,
v.
SALT LAKE CITY SCHOOL DISTRICT;
and BOARD OF EDUCATION OF SALT
LAKE CITY SCHOOLS,
Defendants-Appellees.

———————————

On appeal from the United States District Court, District of Utah,
Honorable Jill N. Parrish, No. 2:21-cv-00706-JNP-CMR

———————————

**ATTACHMENT B**

Docket No. 51 Judgment in a Civil Case Filed 3/31/2023

———————————

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KRISTIN JACOBS, legal guardian of E.J.; AMANDA SANDY, legal guardian of H.S.; and DISABILITY LAW CENTER; | JUDGMENT |
| Plaintiffs, | Case No. 2:21-cv-00706-JNP-CMR |
| v. | District Judge Jill N. Parrish |
| SALT LAKE CITY SCHOOL DISTRICT and BOARD OF EDUCATION OF SALT LAKE CITY SCHOOLS, | |
| Defendants. | |

IT IS ORDERED AND ADJUDGED that the plaintiffs' action is dismissed.


DATED March 31, 2023.

BY THE COURT

Jill N. Parrish
United States District Court Judge

JA 246