IN THE

# United States Court of Appeals

## FOR THE TENTH CIRCUIT

◆◆◆

KRISTIN JACOBS, legal guardian of E.J.; AMANDA SANDY,
legal guardian of H.S.; DISABILITY LAW CENTER,

*Plaintiffs-Appellants,*

—v.—

SALT LAKE CITY SCHOOL DISTRICT;
BOARD OF EDUCATION OF SALT LAKE CITY SCHOOLS,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
HONORABLE JILL N. PARRISH
D.C. NO. 2:21-CV-00706-JNP

**BRIEF FOR *AMICI CURIAE***
**COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC.,**
**NATIONAL DISABILITY RIGHTS NETWORK**
**AND THE ARC OF THE UNITED STATES**
**IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

SELENE ALMAZAN-ALTOBELLI
COUNCIL OF PARENT ATTORNEYS
    AND ADVOCATES
P.O. Box 6767
Towson, Maryland 21285
(844) 426-7224
selene@copaa.org

ELLEN M. SAIDEMAN
LAW OFFICE OF ELLEN SAIDEMAN
7 Henry Drive
Barrington, Rhode Island 02806
(401) 258-7276
esaideman@yahoo.com

*Attorneys for Amici Curiae*

September 29, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 the following disclosure is made on behalf of:

Council of Parent Attorneys and Advocates
National Disability Rights Network
The Arc of the United States

1. No amicus is a publicly held corporation or other publicly held entity;
2. No amicus has parent corporations; and
3. No amicus has 10% or more of stock owned by a corporation.

Respectfully submitted,
*/s/Selene A. Almazan-Altobelli*
Selene A. Almazan-Altobelli
Legal Director
COUNCIL OF PARENT ATTORNEYS
AND ADVOCATES
P.O. Box 6767
Towson, MD 21285
selene@copaa.org
844.426.7224

 Counsel for Amici Curiae

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ...................................................... iii

INTEREST OF *AMICI CURIAE* .................................................. 1

SUMMARY OF ARGUMENT ...................................................... 2

ARGUMENT .................................................................. 6

    I.  CONGRESS RELIED ON THIRTY YEARS OF RESEARCH
        SUPPORTING INCLUSIVE EDUCATION IN
        REAUTHORIZING IDEA IN 2004 .................................. 6

        A.  More Than Forty-Nine Years Of Research Supports
            The Least Restrictive Environment Mandate .................... 6

        B.  Recent Research Confirms that Access to the General
            Education Curriculum and Non-Disabled Peers Benefits
            Students with Disabilities, Particularly Students with
            Intellectual Disabilities ............................................. 9

    II.  THE LOWER COURT DECISION SHOULD BE REVERSED
        BECAUSE IT DID NOT APPLY THE PROPER LRE
        ANALYSIS TO THE CHANGE IN PLACEMENT ................. 12

        A.  The Decision Ignored IDEA Mandates That School
            Districts Educate Students with Disabilities in the Least
            Restrictive Environment ........................................... 12

        B.  *Endrew F.* Addressed the FAPE Standard for Education ....... 15

        C.  This Court has adopted the *Daniel R.R.* Standard ............... 16

        D.  The Application of the *Daniel R.R.* Standard Mandates
            Reversal ............................................................. 21

            1.  Factor 1:  Sufficiency of Supplementary Aids and
                 Services .......................................................... 21

            2.  Factor 2:  Educational Benefit ............................... 23

            3.  Factor 3:  Adverse Effects.................................... 23

4.  Applying the factors to this case.............................. 24

III. THE LOWER COURT DECISION SHOULD BE REVERSED
    BECAUSE IT DID NOT APPLY THE PROPER ANALYSIS
    FOR THE ADA AND SECTION 504 CLAIMS...................... 25

  A.  The Underlying Decision Failed to Analyze the ADA
      Claims Separately ................................................. 25

  B.  The Underlying Decision Failed to Follow Precedent in
      Determining Whether the 504 Claim Sufficiently Alleged
      a Systemic Violation .............................................. 28

CONCLUSION................................................................ 30

CERTIFICATE OF COMPLIANCE........................................... 32

CERTIFICATE OF SERVICE ................................................ 32

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Ass'n for Cmty. Living v. Romer*,
   992 F.2d 1040 (10th Cir. 1993) ............................................ 28

*Daniel R.R. v. State Bd. of Educ.*,
   874 F.2d 1036 (5th Cir. 1989)............................... 16, 17, 18, 22

*Dep't of Educ. v. Katherine D.*,
   727 F.2d 809 (9th Cir. 1983) .............................................. 25

*Ellenberg v. New Mexico Military Institute*,
   478 F.3d 1262 (10th Cir. 2007)............................... 5, 26, 27, 29

*Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*,
   580 U.S. 386 (2017).................................................. 3, 5, 15

*Fowler v. Unified Sch. Dist. No. 259*,
   107 F.3d 797 (10th Cir. 1997)............................................ 16

*Greer v. Rome City Sch. Dist.*,
   950 F.2d 688 (11th Cir. 1991), *withdrawn on other grounds*,
   956 F.2d 1025 (1992) ...............................................*passim*

*H.L. v. Downingtown Area Sch. Dist.*,
   624 F.App'x 64 (3d Cir. 2015) ........................................... 20

*Jacobs v. Salt Lake City Sch. Dist.*,
   2023 U.S. Dist. LEXIS 58624
   (D. Utah Mar. 31, 2023) ..................................... 19, 26, 27, 28

*L.B. v. Nebo Sch. Dist.*,
   379 F.3d 966 (10th Cir. 2004)............................................ 16

*L.H. v. Hamilton County Dep't of Ed.*,
   900 F.3d 779 (6th Cir. 2018) ............................................ 21

*Murray by & through Murray v. Montrose County Sch. Dist. RE-1J*,
   51 F. 3d 921 (10th Cir. 1995)................................... 16, 17, 22

*Oberti v. Bd. of Educ.*,
   995 F.2d 1204 (3d Cir. 1993).......................................*passim*

*Olmstead v. L.C. by Zimring,*
   527 U.S. 581 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Roncker on behalf of Roncker v. Walter,*
   700 F.2d 1058 (6th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H.,*
   14 F.3d 1398 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Urban by Urban v. Jefferson Cnty. Sch. Dist. R-1,*
   89 F.3d 720 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Walczak v. Fla. Union Free Sch. Dist.,*
   142 F.3d 119 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statutes**

20 U.S.C. § 1400(c)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 14, 30

20 U.S.C. § 1400(c)(5)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

20 U.S.C. § 1400(c)(5)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

20 U.S.C. § 1401(33) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

20 U.S.C. § 1412(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

20 U.S.C. § 1412(5)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

20 U.S.C. § 1412(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

20 U.S.C. § 1412(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12, 16

20 U.S.C. § 1412(a)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12

20 U.S.C. § 1414(b)(2)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1414(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1414(d)(1)(A)(i)(II)(aa) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1414(d)(1)(A)(i)(IV)(bb) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

29 U.S.C. § 794, Section 504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 28, 29

42 U.S.C. § 12131 et seq., ADA Title II . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

PAGE(S)

42 U.S.C. § 12132............................................................26

Individuals with Disabilities Education Act ("IDEA").................*passim*

Public Law 94-142, Education for All Handicapped Children Act..........13

**Regulations**

28 C.F.R. § 35.130............................................................26

28 C.F.R. § 35.130(b)(3)(i)...................................................27

28 C.F.R. § 35.130(b)(3)(ii)..................................................27

28 C.F.R. § 35.130(d)........................................................28

34 C.F.R. § 104.4(b)(2)..................................................28, 29

34 C.F.R. § 300.42.......................................................3, 12, 22

34 C.F.R. § 300.116(c) .......................................................13

34 C.F.R. § 300.116(e) ...................................................13, 19

34 C.F.R. § 300.320(a)(5)....................................................13

**Other Authorities**

Autism Self Advocacy Network, *About Autism* (2022), available at
    https://autisticadvocacy.org/about-asan/about-autism/...................3

Xuan Bui, et al., *Inclusive Education Research & Practice*, Maryland
    Coalition for Inclusive Educ., available at https://selpa.info/
    uploads/files/files/Inclusion_Works_article.pdf.........................7

Cramer, Elizabeth (2015), *Shifting Least Restrictive Environments in a
    Large Urban School District*, Journal of Urban Learning and Research,
    Volume 11, 40-40, available athttps://files.eric.ed.gov/fulltext/
    EJ1071415.pdf .......................................................4

Cole, S. M., Murphy, H. R., Frisby, M. B., & Robinson, J. (2023),
    *The Relationship Between Special Education Placement and High
    School Outcomes*, The Journal of Special Education, Volume
    57(1), 13-23, available at https://doi.org/10.1177/
    00224669221097945 .................................................4

Peggy Coyne et al*., Literacy by Design: A Universal Design for Learning Approach for Students with Significant Intellectual Disabilities*, 33 Remedial & Special Educ., 162-72 (2012), available at https://ccids.umaine.edu/wp-content/uploads/sites/26/2013/08/Remedial-and-Special-Education-2012-Coyne-162-72_web.pdf .................................................... 9

Mary Fisher & Lauanna H. Meyer, *Development and Social Competence After Two Years for Students Enrolled in Inclusive and Self-Contained Educational Programs,* 27 Res. & Prac. for Persons with Severe Disabilities 165, 169-73 (2002), available at https://www.researchgate.net/publication/250169854 ................... 8

Kathleen Gee, Mara Gonzalez, and Carrie Cooper, *Outcomes of inclusive versus separate placements: a matched pairs comparison study,* 45 Res. & Prac. for Persons with Severe Disabilities 223-240 (Aug. 6, 2020), available at https://journals.sagepub.com/doi/abs/10.1177/1540796920943469 ..................................... 10

Michael J. Guralnick et al., *Immediate Effects of Mainstreamed Settings on the Social Interactions and Social Integration of Preschool Children*, 100 Am. J. Mental Retardation 359-77 (1996) available at https://depts.washington.edu/chdd/guralnick/pdfs/immed_effects_AJMR_vol100_94.pdf .................................... 7

H. Rep. No. 105-95, reprinted in U.S. Cod. Cong. And Admin. News, 105th Congress, First Session, 97-98 ........................................ 13

Thomas Hehir, et al., Review of Special Education in the Commonwealth of Massachusetts: A Synthesis Report (2014), available at https://www.researchgate.net/publication/316478330 ...... 9

Lewis B. Jackson et al., *The Dynamic Relationship Between Context, Curriculum and Student Learning: A Case for Inclusive Education as a Research Based Practice*, 34 Res. & Prac. for Persons with Severe Disabilities 175-95 (2008) .......................................... 9

Christopher Kliewer & Douglas Biklen, *School's Not Really a Place for Reading: A Research Synthesis of the Literate Lives of Students with Severe Disabilities,* 26 J. Ass'n for Persons with Severe Handicaps 1-12 (2001) ............................................. 11

Jennifer A. Kurth, Kiara Born, and Hailey Love, *"Ecobehavioral Characteristics of Self-Contained High School Classrooms for Students with Severe Cognitive Disability."* Res. & Prac. for Persons with Severe Disabilities 41, 227-43 (2016)...................... 10

Samuel Odom, *Preschool Inclusion: What We Know and Where We Go From Here*, 20 Topics in Early Childhood Special Educ. 21, 20-27 (2000) (Appx. 1) ................................................... 7

Wayne S. Sailor & Amy B. McCart, *Stars in Alignment*, 39 Res. & Prac. for Persons with Severe Disabilities 55, 57-58 (2014) ............. 9

Jane H. Soukup, Michael L. Weymeyer, Susan M. Bashinski, &James A. Boyaird, *Classroom Variables and Access to the General Curriculum for Students with Disabilities*, Exceptional Children 75 (2007): 101-120, available at https://www.researchgate.net/publication/230853231_Classroom_Variables_and_Access_to_the_General_Curriculum_for_Students_With_Disabilities/link/0912f5113e1d43ed85000000/download ................................... 11

Mary Wagner et al., *The Academic Achievement and Functional Performance of Youth with Disabilities,* in A Report of Findings from the National Longitudinal Transition Study-2 (NLTS2) (Menlo Park, CA: SRI International, 2006)............................... 8

Mark Weber, *The Least Restrictive Environment Obligation as an Entitlement to Educational Services: A Commentary*, 5 U.C. Davis J. Juv. L. & Pol'y 147, 148 (2001).................... 24, 25

**INTEREST OF *AMICI CURIAE*[1]**

**Council of Parent Attorneys and Advocates, Inc. (COPAA)** is an independent, nationwide nonprofit organization of attorneys, advocates, and parents in fifty states and the District of Columbia, who are routinely involved in special education advocacy, including due process hearings throughout the country. COPAA's primary goal is to secure appropriate educational services for children with disabilities, echoing a Congressional finding that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1). Children with disabilities are among the most vulnerable in our society, and COPAA is particularly concerned with assuring that every child with a disability receives a free appropriate public education in the child's least restrictive environment (LRE), as the Individuals with Disabilities Education Act (IDEA) requires.

**The National Disability Rights Network (NDRN)** is a nonprofit membership association of protection and advocacy (P&A) agencies in all 50 states,

---

[1] Pursuant to Rule 29(c)(5) of the Federal Rules of Appellate Procedure, *Amici* state that: (A) there is no party, or counsel for a party in the pending appeal who authored the *amicus* brief in whole or in part; (B) there is no party or counsel for a party in the pending appeal who contributed money that was intended to fund preparing or submitting the brief; and (C) no person or entity contributed money that was intended to fund preparing or submitting the brief, other than *Amici* and its members.

the District of Columbia, Puerto Rico, and the United States Territories. There is a P&A agency affiliated with the Native American Consortium, the Native American Disability Law Center, which includes Native American Nations in the Four Corners region of the Southwest. Federal law authorizes P&As to provide legal representation to students with disabilities regardless of educational setting.

P&A agencies handled over 10,000 education matters in the most recent year for which data is available. These education matters include claims under IDEA, Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act.

**The Arc of the United States (The Arc)**, founded in 1950, is the Nation's largest community-based organization of and for people with intellectual and developmental disabilities (IDD). Through its legal advocacy and public policy work, The Arc promotes and protects the human and civil rights of people with IDD and actively supports their full inclusion and participation in the community throughout their lifetimes.

*Amici* has requested consent from Appellees but received no response. Thus, *Amici* have moved for leave to file this Brief. Appellants have given their consent.

## SUMMARY OF ARGUMENT

Before IDEA, children with developmental disabilities were segregated and completely excluded from public schools or consigned to separate schools. Today, students with developmental disabilities frequently graduate from

high school, attend college, and secure competitive integrated employment. *See* Autism Self Advocacy Network, *About Autism* (2022), available at https://autisticadvocacy.org/about-asan/about-autism/ (last visited Sept. 26, 2023); But to achieve the ambitious goals for students with disabilities as required by state and federal special education laws, much is required: supplementary aids and services, trained teachers, paraprofessionals, committed parents, and, perhaps most importantly, *attitudinal* change. 20 U.S.C. §1412(a)(5); 34 C.F.R. § 300.42.

The ruling below is flatly inconsistent with the IDEA and case law interpreting its least restrictive environment (LRE) mandate. Congress has made clear through IDEA (in all its iterations over the past five decades) that one of its overriding priorities was giving students with disabilities access to the general education curriculum and education in the regular classroom to the maximum extent possible. Congress enacted IDEA, an "ambitious piece of legislation," in response to the serious problem that a "majority of handicapped children in the United States were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to drop out." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 397 (2017) (internal quotation marks and citations omitted). Further, the removal of children with disabilities from the regular education environment may occur "only when the nature or severity of the disability

of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A).

This requirement has been strengthened in subsequent reauthorizations of IDEA, and in the most recent reauthorization, Congress found "[a]lmost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by—(A) having high expectations for such children and ensuring their access to the *general education curriculum* in the regular classroom, to the maximum extent possible." 20 U.S.C. §1400(c)(5) (emphasis added).

IDEA's mandates are not empty aspirations: decades of scientifically based research demonstrates that children with disabilities achieve considerably more educational benefit from placement in general education classes with access to the general education curriculum through supplementary aids and services than from placement in special education classrooms or schools with limited access or no access to their age-appropriate non-disabled peers or general education curriculum. *See e.g.* Cole, S. M., Murphy, H. R., Frisby, M. B., & Robinson, J. (2023), *The Relationship Between Special Education Placement and High School Outcomes*, The Journal of Special Education, Volume 57(1), 13–23. https://doi.org/10.1177/00224669221097945. Research also supports that when students with and without disabilities spend time together, all students benefit, *not only* those with learning differences; thus, there is a positive correlation between academic achievement and inclusion. *See e.g.* Cramer,

Elizabeth (2015), *Shifting Least Restrictive Environments in a Large Urban School District*, Journal of Urban Learning and Research, Volume 11, 40-40. https://files.eric.ed.gov/fulltext/EJ1071415.pdf

In addition, the ruling below is inconsistent with binding Tenth Circuit precedent in *Ellenberg v. New Mexico Military Institute,* 478 F.3d 1262 (10th Cir. 2007) with respect to the denial of the systemic Section 504 claims and of the summary rejection of the ADA claim. The Section 504 and ADA claims assert distinct and legally recognizable violations from an anti-discrimination perspective and are entitled to separate and more thorough review. Unfortunately, Salt Lake City School District continues the practice of allowing for segregation and different spaces for those with disabilities. The Supreme Court has chastened schools that undervalue the potential for even profoundly disabled students and warned the IEPs of children with disabilities must be "appropriately ambitious" to enable them to make progress in the *general education curriculum* in light of their unique abilities. *Endrew F.* at 399. The Court explained that children with disabilities are to be challenged to reach their potential progress in the same manner as their non-disabled peers are.

For most students, including students with developmental disabilities, this progress happens most effectively when children with disabilities are given access to the general education curriculum and included in the general education classrooms with their peers without disabilities, and this is supported by the fact that

school districts must demonstrate (through assessments and data tracking progress) why a student *should not* be in the general education environment or accessing the general education curriculum. *See* 20 U.S.C. §§ 1414(b)(2)(A)(ii) (evaluation), 1414(d)(1)(A)(i)(I)(aa) (statement of present levels vis-a-vis ability to access general education curriculum), 1414(d)(1)(A)(i)(II)(aa) (statement of goals designed to "enable the child to be involved in and make progress in the general education curriculum"), and 1414(d)(1)(A)(i)(IV)(bb) (statement of special education, related services, and supplementary aids and services to enable the child to be involved in and make progress in the general education curriculum and to participate in extracurricular and nonacademic activities). Further, school districts are required to comply both with *Endrew F.*'s requirement that IEPs be "appropriately ambitious" and the statutory requirement that students receive their educational services in the children's least restrictive environment.

## ARGUMENT

I. **CONGRESS RELIED ON THIRTY YEARS OF RESEARCH SUPPORTING INCLUSIVE EDUCATION IN REAUTHORIZING IDEA IN 2004**

A. **More Than Forty-Nine Years Of Research Supports The Least Restrictive Environment Mandate**

In amending IDEA nearly twenty years ago, Congress relied on "30 years of research and experience" when it renewed its commitment to placement of students with disabilities in general education classrooms in the 2004 reauthorization of

IDEA. 20 U.S.C. §1400(c)(5).  Scientific-based research shows that students with disabilities educated in general education classes perform better academically and socially than comparable students educated in segregated settings, regardless of the type of disability or grade level. *See, e.g.,* Xuan Bui, et al., *Inclusive Education Research & Practice*, Maryland Coalition for Inclusive Educ., https://selpa.info/uploads/files/files/Inclusion_Works_article.pdf (last visited Sept. 26, 2023) (compiling research on inclusive practices demonstrating that included children perform better academically and socially and have a positive effect on their non-disabled peers); Michael J. Guralnick et al., *Immediate Effects of Mainstreamed Settings on the Social Interactions and Social Integration of Preschool Children*, 100 Am. J. Mental Retardation 359-77 (1996) available at https://depts.washington.edu/chdd/guralnick/pdfs/immed_effects_AJMR_vol100_94.pdf (last visited Sept. 26, 2023) (finding that the behavior of children with disabilities appears to be positively affected by participation in activities and classrooms with typically developing children); Samuel Odom, *Preschool Inclusion: What We Know and Where We Go From Here*, 20 Topics in Early Childhood Special Educ. 21, 20-27 (2000) (Appx. 1) (noting that various studies "found that children with severe disabilities who participate in inclusive settings appear to score higher on standardized measures of development than comparable children enrolled in traditional special education settings").

A 2002 study compared results on measures of child development and social competence for children in inclusive programs versus children in segregated or "self-contained" programs over a two-year study period. *See* Mary Fisher & Lauanna H. Meyer, *Development and Social Competence After Two Years for Students Enrolled in Inclusive and Self-Contained Educational Programs,* 27 Res. & Prac. for Persons with Severe Disabilities 165, 169-73 (2002), https://www.researchgate.net/publication/250169854 (last visited Sept. 26, 2023). The children enrolled in inclusive programs achieved statistically better results than the children in the segregated programs. The authors concluded:

> The results of this study point to greater gains on psychometrically valid measures for students who were included in general education settings in comparison to matched peers who were segregated. Moving instruction into inclusive environments, rather than providing instruction in isolation from normalized learning opportunities . . . seems to be beneficial for individual child learning outcomes.

*Id*. at 172-73.

Similarly, beginning in 2001, the National Longitudinal Transition Study examined the outcomes of 11,000 students with a range of disabilities. The study found that more time spent in a general education classroom was positively correlated with a) fewer absences from school, b) fewer referrals for disruptive behavior, and c) better outcomes after high school in the areas of employment and independent living. Mary Wagner et al., *The Academic Achievement and Functional Performance of Youth with Disabilities,* in A Report of Findings from the National

Longitudinal Transition Study-2 (NLTS2) (Menlo Park, CA: SRI International, 2006). This research also supports the conclusion that inclusion and achievement are positively correlated.

   **B. Recent Research Confirms that Access to the General Education Curriculum and Non-Disabled Peers Benefits Students with Disabilities, Particularly Students with Intellectual Disabilities**

   Authoritative research after the reauthorization of IDEA in 2004 confirms the marked academic and social improvement in children with disabilities who are educated alongside their typical peers in the general education classroom. *See, e.g.*, Wayne S. Sailor & Amy B. McCart, *Stars in Alignment*, 39 Res. & Prac. for Persons with Severe Disabilities 55, 57-58 (2014) (collecting studies and noting benefit to *all* students of educational practices that support inclusion); Thomas Hehir, et al., Review of Special Education in the Commonwealth of Massachusetts: A Synthesis Report (2014), https://www.researchgate.net/publication/316478330 (last visited Sept. 26, 2023); *see also* Lewis B. Jackson et al., *The Dynamic Relationship Between Context, Curriculum and Student Learning: A Case for Inclusive Education as a Research Based Practice*, 34 Res. & Prac. for Persons with Severe Disabilities 175-95 (2008); Peggy Coyne et al.*, Literacy by Design: A Universal Design for Learning Approach for Students with Significant Intellectual Disabilities*, 33 Remedial & Special Educ., 162-72 (2012), available at https://ccids.umaine.edu/wp-content/uploads/sites/26/2013/08/Remedial-and-Special-Education-2012-Coyne-162-72_

web.pdf (last visited Sept. 26, 2023) (students with significant disabilities can learn academic content, build social competence and develop friendships with peers).

In an analysis of self-contained classes, experts observed special education classes that were spacious, well-staffed by educators and paraprofessionals, and supplied with adequate resources—many of the supports supposed to address the unique needs of students with disabilities. Despite these supports and resources, they found both a remarkable lack of time that students spent in *actual* instruction, and that paraprofessionals, not teachers, primarily provided the instruction that did occur. Further, they found there were few opportunities for students to respond to instructional cues, a high level of distractions in the classroom, a lack of communication supports for students, and a lack of individualized instruction. Jennifer A. Kurth, Kiara Born, and Hailey Love, *"Ecobehavioral Characteristics of Self-Contained High School Classrooms for Students with Severe Cognitive Disability."* Res. & Prac. for Persons with Severe Disabilities 41, 227–43 (2016). *See also* Kathleen Gee, Mara Gonzalez, and Carrie Cooper, *Outcomes of inclusive versus separate placements: a matched pairs comparison study,* 45 Res. & Prac. for Persons with Severe Disabilities 223-240 (Aug. 6, 2020), available at https://journals.sagepub.com/doi/abs/10.1177/1540796920943469 (last visited Sept. 26, 2023) (finding students with disabilities in general education classes had significantly higher levels of "engaged learning, social interactions, and involvement

in typical curricular activities" compared to peers in separate classes). It would appear, then, that in many (if not most) cases, the well-meaning plans to "do more" in these segregated settings actually have the counter-effect and will lead to *less* effective support to students in terms of learning.

Research demonstrates the benefits of inclusion in the general education classroom, especially for children who have significant support needs, such as E.J. and H.S. Although students with extensive support needs (*i.e.*, students with intellectual disabilities, multiple disabilities, or autism) have higher rates of segregated schooling, research shows these students actually acquire more academic benefits when included in general education instruction, particularly increases in literacy skills. Christopher Kliewer & Douglas Biklen, *School's Not Really a Place for Reading: A Research Synthesis of the Literate Lives of Students with Severe Disabilities,* 26 J. Ass'n for Persons with Severe Handicaps 1–12 (2001); *see also* Jane H. Soukup, Michael L. Weymeyer, Susan M. Bashinski, &James A. Boyaird, *Classroom Variables and Access to the General Curriculum for Students with Disabilities*, Exceptional Children 75 (2007): 101–120 https://www.researchgate.net/publication/230853231_Classroom_Variables_and_Access_to_the_General_Curriculum_for_Students_With_Disabilities/link/0912f5113e1d43ed85000000/download (last visited Sept. 26, 2023).

## II. THE LOWER COURT DECISION SHOULD BE REVERSED BECAUSE IT DID NOT APPLY THE PROPER LRE ANALYSIS TO THE CHANGE IN PLACEMENT

### A. The Decision Ignored IDEA Mandates That School Districts Educate Students with Disabilities in the Least Restrictive Environment

IDEA requires that states receiving federal funds provide an education to all children with disabilities in the LRE, 20 U.S.C. § 1412(a)(5). The statute requires, "To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A).

The statute requires IEP teams to document when departures from the general education setting and curriculum are mandated, 20 U.S.C. § 1414(d), and school districts may not unnecessarily restrict a child if that child's IEP can be implemented using supplementary aids and services[2] in a regular education classroom in the student's neighborhood school. Further, a student cannot be removed from general

---

[2] Supplementary aids and services mean "aids, services and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate . . .." 34 C.F.R. § 300.42.

education classes based solely on a need for curriculum modification. 34 C.F.R. § 300.116(e). And if a student will not be participating in general education classes, justification for that exclusion must be provided in the IEP. 34 C.F.R. §300.320(a)(5). Additionally, "[u]nless the IEP of a child with a disability requires some other arrangement," the child must be educated in the school that he or she would attend if nondisabled. 34 C.F.R. §300.116(c).

IDEA and its implementing regulations require educating students with disabilities in regular education classrooms, unless and until there is substantial justification to the contrary.[3]  Indeed, students' Fourteenth Amendment right to avoid seclusion and re-segregation underpins the IDEA and its precursor, the Education for All Handicapped Children Act. These protections emerged as statutory and regulatory obligations:

> [T]he Act also contains a specific directive regarding the placement of handicapped children. The Act requires the state to establish procedures to assure that, to the maximum extent appropriate, handicapped children . . . are educated with children who are not handicapped.

---

[3] IDEA 1997 *renewed and strengthened* the obligations attendant to the LRE requirements. The considerations of inclusion and attending class with age appropriate peers and access to the general curriculum were expressly reinforced in IDEA 1997:

> The new focus is intended to produce attention to the accommodations and adjustments necessary for disabled children to access the general educational curriculum and the special services which may be necessary for appropriate participation in particular areas of the curriculum due to the nature of the disability.

*H. Rep. No. 105-95, reprinted* in U.S. Cod. Cong. And Admin. News, 105th Congress, First Session, 97-98.

With this directive, which is often referred to as "mainstreaming" or placement in the "least restrictive environment," Congress created a statutory preference for educating handicapped children with nonhandicapped children.

*Greer v. Rome City Sch. Dist.*, 950 F.2d 688, 695 (11th Cir. 1991), *withdrawn on*

*other grounds*, 956 F.2d 1025 (1992). This right to the LRE is independent of the

right to a free appropriate public education (FAPE). *Id*. at 695-96.

In its 2004 Reauthorization of IDEA, Congress, in its findings, emphasized

the importance of educating children with disabilities in the regular classroom:

Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by-

(A)    having high expectations for such children and ensuring their access to the general education curriculum in the regular classroom, to the maximum extent possible …

(C)    coordinating this chapter with other local, educational service agency, State, and Federal school improvement efforts... that *special education can become a service for such children rather than a place where such children are sent;*

(D)    *providing appropriate special education and related services, and aids and supports in the regular classroom, to such children, whenever appropriate.…*

20 U.S.C. § 1400(c)(5) (emphasis added).

Congress recognized that "*special education can become a service for such*

*children rather that a place where such children are sent*." *Id.* § 1400(c)(5)(C)

(emphasis added). Accordingly, Congress has made involvement and progress in the

"regular classroom" and general curriculum an overall priority and goal for students with disabilities. 20 U.S.C. §1400(c)(5)(D). The lower court failed to adhere to these LRE requirements and requisite analysis and its decision should be reversed.

## B. *Endrew F.* Addressed the FAPE Standard for Education

In rejecting the Tenth Circuit's low standard of receiving "merely more than *de minimis*" educational benefit to determine whether a child with disabilities has been provided a FAPE, the Supreme Court clarified that: "The IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 400. The Court held and emphasized that the IEP must be "appropriately ambitious," and the objectives must be "challenging." *Id.* at 402.

*Endrew F.* emphasized the importance of compliance with IDEA's procedures, which include the LRE requirement. The Supreme Court rejected the argument that such provisions governing the IEPs required components "impose only procedural requirements – a checklist of items the IEP must address – not a substantive standard enforceable in court." *Endrew F.*, *Id*. at 402. The Supreme Court explained, the "procedures are there for a reason." *Id.* They provide insight into what it means to meet the unique needs of a child with a disability. *Id.* And as the regulations set forth, the unique needs of a child with a disability must be met in the child's LRE.

## C. This Court has adopted the *Daniel R.R.* Standard

IDEA provides federal grants to states, which the states then give to local educational agencies to assist in educating students with disabilities. *Fowler v. Unified Sch. Dist. No. 259*, 107 F.3d 797, 801 (10th Cir. 1997). The IEP is the basic mechanism through which each child's individual goals are achieved. *Murray by & through Murray v. Montrose County Sch. Dist. RE-1J,* 51 F. 3d 921, 925 (10th Cir. 1995). IDEA contains both procedural requirements to ensure the proper development of an IEP, and substantive requirements designed to ensure that each child receives a FAPE. *Id.* States must comply with IDEA's requirements, including providing each child with a disability FAPE in an LRE, in order to receive funds under the statute. 20 U.S.C. § 1412 (a)(1) and (a)(5).

This Court addressed *L.B. v. Nebo Sch. Dist.*, 379 F.3d 966 (10th Cir. 2004)*.* The parents were seeking additional services for their child in a less restrictive setting. This Court adopted the *Daniel R.R.* test and found that K.B. derived greater academic benefits from the mainstream class than she would have received in the school district's self-contained classroom. *Daniel R.R. v. State Bd. of Educ.,* 874 F.2d 1036, 978 (5th Cir. 1989). It also found that she obtained greater non-academic benefits in the mainstreamed class than in a self-contained class as the mainstreamed class provided K.B. "with appropriate role models, had a more balanced gender ratio, and was generally better suited to meet K. B's behavior and social needs" than the

proposed school district placement. *Id*. The Tenth Circuit cited to *Murray,* and stated that, as of the *Murray* decision, it had "not yet adopted a specific standard for determining whether the LRE requirement was met." *Id*. at 977. The Tenth Circuit found that its decision in *Nebo* was entirely consistent with its earlier holding in *Murray*. The lower court in this case completely ignored the holdings of this Court in *Nebo*; it did not cite to *Nebo* and failed to address the adopted *Daniel R.R.* test.

A majority of circuits have considered this issue when employing the LRE standard established in *Daniel R.R* to determine whether inclusive placements for students with disabilities are required. See, e.g., *Walczak v. Fla. Union Free Sch. Dist.,* 142 F.3d 119, 132 (2d Cir. 1998); *Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H.*, 14 F.3d 1398, 1403 (9th Cir. 1994); *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1213-14 (3d Cir. 1993); *Greer*, 950 F.2d at 695**.**

The Fifth Circuit identified IDEA's "strong preference for mainstreaming" and articulated a test for determining the appropriateness of a student's placement in regular education classes.[4]

---

[4] The Court in *Daniel R.R.*, 874 F.2d 1036*,* described a tension that exists when balancing the mainstreaming requirements of the Act and the requirement that an educational program be individualized. *Id.* at 1044. That tension arises during the determination of the student's placement in the LRE. The 1997 amendments to IDEA rectified this tension, largely by clarifying the role of supplementary aids and services in assisting in the implementation of a student's IEP in regular education classrooms and the obligation of school districts to make proper use of such aids and services.

> First we ask whether education in the regular classroom with the use of supplementary aids and services, can be achieved satisfactorily for a given child. If it cannot and the school intends…to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate."[5]

*Id*. at 1048. The Third Circuit noted, "this two-part test, which closely tracks the language of § 1412(5)(B), is faithful to IDEA's directive that children with disabilities be educated with nondisabled children 'to the maximum extent appropriate,' 20 U.S.C. § 1412(5)(B), and to the Act's requirement that schools provide individualized programs to account for each child's specific needs." *Id.* at 1215.

The *Oberti* decision is the bellwether for explaining *how* supplementary services allow a child with Down syndrome greater structural support in order to access the general education curriculum. The Court explained that supports for inclusion of a child with disabilities to access the general education classroom and curriculum requires teacher training and supports like resource room or itinerant teaching—not removal to a separate class on a separate alternative curriculum. *Id.* at 1212. However, in the instant case, the students E.J. and H. S. never received an IEP that required a separate program. Rather, the decision was made outside the IEP

---

[5] *Id* at 1048. Significantly, the court reasoned that academic achievement is not the sole determinant of mainstreaming and access to regular education cannot be denied simply because the progress of a student with a disability will not be equal to that of a nondisabled student.

meeting and was made for administrative convenience. As the lower court recognized, the school district did not determine the placement for E.J. and H.S. based on an individualized consideration of their needs. Instead, in the "Spring of 2019, the [school district] announced that special education services for students with cognitive disabilities would be provided in a handful of 'hub' schools." *Jacobs v. Salt Lake City Sch. Dist.*, 2023 U.S. Dist. LEXIS 58624, at *1 (D. Utah Mar. 31, 2023).

The district court in *Oberti* found that the school did not properly consider "an itinerant teacher trained in aiding students with mental retardation," "modification of the regular curriculum to accommodate Rafael," and "special education training and consultation for the regular teacher." *Id.*at 1212(citing *Oberti v. Bd. of Educ. of Clementon Sch. Dist.*, 801 F. Supp. 1392, 1397 (D.N.J. 1992)). The Third Circuit agreed, finding the "continuum" is not an "all or nothing educational system." *Id.* at 1218. The court also affirmed the proposition that the school "must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction." *Id.* at 1216. Finally, the court rejected the student's need for a modified curriculum as a basis for exclusion. *Id.* at 1222. IDEA contemplates that children with disabilities may lag behind their peers and need modifications to the general education curriculum. 34 C.F.R. §300.116(e).

*Oberti* relied on an earlier Eleventh Circuit case involving Christy Greer, a ten-year-old child with Down syndrome, *Greer*, 950 F.2d at 690. The school system "proposed placing Christy in a self-contained special education class.... The self-contained class was located at Southeast Elementary School, which also had classes for non-handicapped children." *Id.* at 691.

In *Greer*, the Eleventh Circuit applied the language of IDEA regulations to conclude that resource room and itinerant instruction had never been attempted:

> *The school district must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction, for which it is obligated under the Act and the regulations promulgated thereunder to make provision.* Only when the handicapped child's education may not be achieved satisfactorily, even with one or more of these supplemental aids and services, may the school board consider placing the child outside of the regular classroom.

950 F.2d at 696 (emphasis added).

In these cases, the courts reasoned that the one-on-one instruction provided in self-contained classrooms also could be provided through "resource rooms" or through "itinerant instruction," which are less restrictive environments for these children, because again, as both courts explained, by law, the use of "resource rooms" or itinerant instruction" are supplements to general education. *Oberti*, 995 F.2d at 1216; *Greer,* 950 F.2d at 696. *See also H.L. v. Downingtown Area Sch. Dist.*, 624 F. App'x 64, 68 (3d Cir. 2015).

These court decisions hold schools cannot require that students like E.J. and H.S. must keep pace with the grade level curriculum as a prerequisite to participating in general education classes with their typically developing peers. [6]

## D. The Application of the *Daniel R.R.* Standard Mandates Reversal

The line of cases cited above, in particular, *Daniel R.R., Rachel H., Greer,* and *Oberti*, forged a test and establishes three factors to be used to determine whether a school system has fulfilled its obligation to place children with disabilities in the mainstream of the regular education classroom to the maximum extent appropriate.

### 1. Factor 1: Sufficiency of Supplementary Aids and Services

The first factor to consider in applying this test is whether the school system has made attempts to accommodate the student in regular education and if it has, whether its efforts are sufficient. The Fifth Circuit said, "[i]f the state has made no

---

[6] A case from the Sixth Circuit, *L.H. v. Hamilton County Dep't of Ed.*, 900 F.3d 779 (6th Cir. 2018), involved a district's decision to remove a student with Down Syndrome from a general education placement (with pull-out 1:1 special education instruction) and place the student in a self-contained special education class at another school for most academic instruction. While the Sixth Circuit did not articulate the *Daniel R.R.* standard, its holding is consistent with the Courts in the Third, Fifth, Ninth and Eleventh cited in Section II A. Affirming a district court decision, the Sixth Circuit held that the segregated classroom was more restrictive than necessary. The Court held that a placement which may be better for academic reasons may still not be appropriate because it is more restrictive. *Id.* at 789. The Sixth Circuit noted that a child need not master the regular education grade level curriculum to remain in a general education classroom; the standard is whether the child, with appropriate supplemental aids and services, can make progress toward the IEP's goals in the regular education setting. *Id.* at 793.

effort to make such accommodating steps, our inquiry ends, for the state is in violation of the Act's express mandate to supplement and modify regular education." *Daniel R.R.*, 874 F.2d at 1048*.* And, in making such accommodations, the school district "must consider the whole range of supplementary aids and services…" *Greer,* 950 F.2d at 696; *Oberti,* 995 F.2d at 1216*;* 20 U.S.C. § 1401(33); 20 U.S.C. § 1412 (5)(A); 34 C.F.R. § 300.42.

The lower court did not consider whether E.J. and H.S. could be satisfactorily educated in the regular education classroom with supplementary aids and services, but instead found the decisions in *Murray* and *Urban by Urban v. Jefferson Cnty. Sch. Dist. R-1*, 89 F.3d 720 (10th Cir. 1996), foreclosed an LRE analysis. Yet, the court completely ignored *Nebo*, which was decided subsequent to both *Murray* and *Urban* and adopted the *Daniel R.R.* analysis. Further, the school districts in *Murray* and *Urban* followed the IEP process and first prepared IEPs before determining the placement in light of the IEP. In *Murray*, the IEP team met and modified the IEP and then recommended that the student be placed in the severe needs program at Northside, based on the student's IEP. *Murray*, 51 F.3d at 924. In *Urban*, the hearing officer required the school district to determine whether services available in his local public school could be used for his IEP and the IEP team subsequently developed a new IEP and determined that the Challenge Program at a different public

school, Golden High School, would provide the student with FAPE. *Urban,* 89 F.3d at 723-24. There was no IEP analysis in this instant case.

## 2. Factor 2:  Educational Benefit

The second factor to consider is whether the student can receive meaningful academic or non-academic educational benefit from the LRE. The Court in *Greer* noted:

> A determination by a school district that a handicapped child will make academic progress more quickly in a self-contained special education environment may not justify educating the child in that environment if the child would receive considerable non-academic benefit, such as language and role-modeling, from association his or her non-handicapped peers.

*Greer*, 950 F.2d at 697.  The Fifth Circuit in *Daniel R.R.* found that a child with disabilities need not perform at the same pace as non-disabled peers.  The disparity in the academic progress is not sufficient reason to deny the child with disabilities access to regular education.

The lower court did not consider either the academic or the non-academic benefits E.J and H.S. would receive and experience from a regular education classroom.  The lower court did not address evidence that the student could learn satisfactorily in a less restrictive setting.

## 3. Factor 3:  Adverse Effects

The next factor to consider is whether there are any negative or adverse effects from the students' placement in a regular high school, either to E.J. and H.S. and

their classmates. In order to weigh against placement in regular education, this adverse effect needs to rise to a level so as to "significantly impair the education of other children in the class." *Oberti*, 995 F.2d at 1217. There is no evidence that their presence would be a detriment to their classmates.

### 4. Applying the factors to this case

The lower court did not apply the factors of the LRE standard. Nor did it note that Salt Lake City did not make a placement decision through the IEP process. The lower court did not address the LRE standard set by the majority of circuits, and this circuit, and, therefore, did not discuss "whether education in the regular classroom with the use of supplementary aids and services, can be achieved satisfactorily for" these students. The lower court failed to note that the school district made a unilateral decision outside the IEP process. The lower court erroneously determined the only placement for all students with intellectual disabilities is a hub school without any consideration of whether they required any educational services only available in a hub school.

Professor Mark Weber posits that IDEA creates an entitlement to services in the LRE:

> When a court asks if a school district has provided all the services that could make special classes or separate schooling unnecessary, it effectively creates a positive entitlement to services. This positive entitlement has two dimensions, one heightening the level of services to which a child is entitled under the special education law, the other

lessening the degree of deference to local decision making that the law requires.

Mark Weber, *The Least Restrictive Environment Obligation as an Entitlement to Educational Services: A Commentary*, 5 U.C. Davis J. Juv. L. & Pol'y 147, 148 (2001).

States that accept IDEA funding do not face the question of *whether* a student should be educated in the least restrictive environment. Rather, Congress has required States and school districts to determine *how* a child can be educated in the LRE. Thus, school districts must, as a preliminary matter in every IEP meeting determine whether the child can be provided with an appropriate education in the regular education classroom with supplementary aids and services. *See Dep't of Educ. v. Katherine D.*, 727 F.2d 809, 815 (9th Cir. 1983).

## III.  THE LOWER COURT DECISION SHOULD BE REVERSED BECAUSE IT DID NOT APPLY THE PROPER ANALYSIS FOR THE ADA AND SECTION 504 CLAIMS

### A.  The Underlying Decision Failed to Analyze the ADA Claims Separately

Under the requirements of Title II of the ADA, 42 U.S.C. § 12131 et seq., a district may not discriminate against students on the basis of their disabilities. Pursuant to the ADA "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination

by any such entity." 42 U.S.C. § 12132; *see* 28 C.F.R. § 35.130. School officials may not permit practices that result in the unnecessary segregation of children with disabilities who can be educated effectively for the full day in school alongside their nondisabled peers.

Here, the lower court improperly analyzed the appellant's separate IDEA and ADA claims together. *Jacobs v. Salt Lake City School District,* at*21 ("The crux of the plaintiffs' claims under both IDEA and the ADA is that the SLCSD's hub policy violates the protections afforded by these statutes because the district's placement decisions are not individualized."). The lower court then based its dismissal of IDEA and ADA claims on its reading of *Murray* and *Urban*, holding that those decisions "foreclose" any claim for entitlement to a neighborhood school, whatever the reasoning. *Id*. The decision to analyze IDEA and ADA claims together, however, is inconsistent with this Court's decision in *Ellenberg,* which came **after** both *Urban* and *Murray*. *Ellenberg*, in its analysis of whether the ADA claims were subject to administrative exhaustion, clarified there was a rebuttable presumption that the ADA and IDEA claims were not separable. *Ellenberg*, 478 F.3d at 1280. Underlying this analysis is that there is a legal distinction between those claims warranting separate analyses. This Court explained:

> (O)ur precedent does not hold that a party's discrimination claims under the RA and the ADA must automatically be dismissed if an IDEA claim fails. Any other interpretation of our caselaw would mean that a state educational institution that receives public funding could openly

discriminate against applicants with disabilities so long as the state offered the student a FAPE in the least restrictive environment.

*Id.* at 1281-1282.

While the lower court determined that plaintiffs exhausted administrative remedies with respect to IDEA and ADA claims, it failed to analyze those claims separately. In addition to improperly analyzing IDEA claims noted *supra*,[7] the lower court also did not conduct a thorough legal analysis of the distinct ADA standards as alleged by the appellants. (JA.1:075-76 ¶¶181-193.). The lower court did not review the appellant's claim that the district's policy codified in 2019 violated the ADA at 28 C.F.R. § 35.130(b)(3)(i), (ii) (prohibition on "criteria or methods of administration" that "have the effect of subjecting qualified individuals with disabilities to discrimination," or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]) Instead, the lower court only summarily concluded that there was no "right" to a particular school. *Jacobs* at \*8. *Ellenberg* requires a dedicated analysis of the appellants' separate ADA claims in order to ensure the appellee is not discriminating on the basis of disability on account of its use of a determinative categorical disability placement policy.

---

[7] Indeed, *Amici* contend that the lower court erred as a matter of law with respect to its analysis of IDEA and disability discrimination claims.

**B. The Underlying Decision Failed to Follow Precedent in Determining Whether the 504 Claim Sufficiently Alleged a Systemic Violation**

Section 504, 29 U.S.C. § 794, requires entities that receive federal financial assistance to provide aids, benefits, and services to individuals with disabilities in the most integrated setting appropriate to the individual's needs. 34 C.F.R. § 104.4(b)(2). Congress enacted the ADA and Section 504 to directly address the discrimination that people with disabilities face when they are unnecessarily excluded from public life, such as the public school system, due to their disabilities. *See Olmstead v. L.C. by Zimring*, 527 U.S. 581, 599–601 (1999); *see also* 28 C.F.R. § 35.130(d).

The lower court, relying on this Court's *Romer* decision from 1993, *Ass'n for Cmty. Living v. Romer*, 992 F.2d 1040 (10th Cir. 1993), determined that in the context of administrative exhaustion,

> the systematic failure exception does not apply to the plaintiffs in this case because they 'do not target structural ... concerns, but rather the effect of a single component of [the SLCSD's] educational program on individual children's' individualized education programs. *Romer*, 992 F.2d at 1044. Additionally, the question of whether these predetermined hub placements deny the plaintiffs a free appropriate public education requires inquiry into the factual details of each particular child's case, further demonstrating that the systematic failure exception does not apply.

*Jacobs* at *18.

This reasoning by the lower court is incorrect in two critical respects. First, the lower court failed to analyze this Court's *Ellenberg* decision from 2007. In

*Ellenberg*, this Court permitted an exception to the administrative exhaustion requirement to apply where the plaintiff's alleged that a "written policy" denied admission to a school. *Ellenberg* at 1280-1281. Here, the appellants assert that the district's codified policy denies students admission to the local school. This codified policy places students with developmental or intellectual disabilities into categories of "mild/moderate" or "severe." Once this designation is completed, the policy is a clear gatekeeper for admission to the local school. Either students are in these categories, or they are not. If they are unilaterally placed by the district into those categories, they cannot attend the local school. This policy is analogous to *Ellenberg* where this Court determined that a student could pursue a Section 504 claim challenging a policy governing whether a student could be admitted to the military academy. *Id.* at 1282.

Second, there is no need for a court to inquire into the particular facts of an individual case, as maintained by the lower court. If a child is in the "mild/moderate" or "severe" category, that child is denied attendance to the neighborhood school. Just as in *Ellenberg,* no further inquiry into the facts of an individual case is required. Ultimately, "pre-determined hub placements" fail to meet 504's requirement that students be served in the most integrated setting appropriate to the individual's needs. 34 C.F.R. § 104.4(b)(2). As such, the lower court's dismissal of the 504 claim was inconsistent with both Section 504 and *Ellenberg* and should be reversed.

## CONCLUSION

An oft-used quotation among special educators is that "special education is not a *place*." *See* 20 U.S.C. §1400(c)(5). As explained above, the goal of inclusion is to bring educational services *to the child with a disability*, not remove the child to go to the service. *See e.g., Roncker on behalf of Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983).

Allowing the school district to bypass the IEP process to require that all students with intellectual disabilities receive their education in hub schools, effectively reverses more than forty years of legal precedent requiring the education of students with disabilities in their LRE. The District should also not be permitted to use hub schools in a manner contrary to the anti-disability discrimination principles in the ADA and Section 504. Accordingly, *Amici* respectfully submit that the judgment be reversed.

Dated: September 29, 2023

Respectfully submitted,

  */s/Selene Almazan-Altobelli*
SELENE ALMAZAN-ALTOBELLI
Council of Parent Attorneys and Advocates
P.O. Box 6767
Towson, Maryland 21285
 (844) 426-7224
selene@copaaa.org

*/s/ Ellen Saideman*
ELLEN MARJORIE SAIDEMAN
Law Office of Ellen Saideman
7 Henry Drive
Barrington, Rhode Island 02806
(401) 258-7276
esaideman@yahoo.com

*Counsel for Amici Curiae*

## CERTIFICATION OF COMPLIANCE PURSUANT TO
## FED. R. APP. 32(a)(7)(C)

I certify that, pursuant to Fed. R. App. P. 32(a)(7)(C), the attached *amicus* brief is proportionately spaced, has a typeface of 14 points and 6,477 contains words.

*/s/Selene Almazan-Altobelli*
Selene Almazan-Altobelli

Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on September 29, 2023 the foregoing document was served on all parties or their counsel of record through the CM/ECF if they are registered users.

*/s/Selene Almazan-Altobelli*
Selene Almazan-Altobelli

Attorney for *Amici Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Webroot Endpoint Protection v.9.0.31.86, September 29, 2023, and according to the program are free of viruses.

Respectfully submitted,
*/s/Selene A. Almazan-Altobelli*
Selene A. Almazan-Altobelli
Legal Director
COUNCIL OF PARENT ATTORNEYS
AND ADVOCATES
P.O. Box 6767
Towson, MD 21285
selene@copaa.org
844.426.7224

Counsel for Amici Curiae